776 So.2d 255 (2001)
CITY OF WINTER SPRINGS, Florida, etc., Appellant,
v.
STATE of Florida, et al., Appellees.
No. SC00-413.
Supreme Court of Florida.
January 11, 2001.
*256 Arthur J. England, Jr., of Greenberg Traurig, P.A., Miami, FL; George H. *257 Nickerson, Jr., Gregory T. Stewart, and Virginia Saunders Delegal of Nabors, Giblin & Nickerson, P.A., Tallahassee, FL; Anthony A. Garganese, City Attorney, Brown, Ward, Salzman & Weiss, P.A.; and Virginia B. Townes of Akerman, Senterfitt & Eidson, P.A., Orlando, FL, for Appellant.
Michael D. Jones and Clifton H. Gorenflo of Leffler & Associates, P.A., Winter Springs, FL; and Beth Richards Rutberg, Assistant State Attorney, Sanford, FL, for Appellees.
HARDING, J.
We have on appeal the final judgment of the trial court refusing to validate special assessment bonds. We have jurisdiction. Art. V, § 3(b)(2), Fla. Const. For the reasons expressed, we reverse the trial court's judgment and remand the cause for further bond validation proceedings.
Appellant, the City of Winter Springs, Florida (City), filed a complaint for validation of special assessment bonds for the financing of local improvements in a discrete portion of the City known as the Tuscawilla Lighting and Beautification District (District).[1] Proposed improvements include enhanced landscaping, signage, and lighting at various locations within the District. Appellees, the State of Florida and Intervenors on behalf of the Property Owners and Citizens of the City of Winter Springs (Validation Opponents), filed an answer opposing validation of the bonds. After a bench trial, the trial court denied the City's complaint to validate the bonds, holding that the special assessment was not in compliance with the law. The City timely filed this direct appeal.
This Court's scope of review in bond validation cases is limited to the following issues: (1) whether the public body has the authority to issue bonds; (2) whether the purpose of the obligation is legal; and (3) whether the bond issuance complies with the requirements of the law. See State v. Inland Protection Fin. Corp., 699 So.2d 1352 (Fla.1997); Poe v. Hillsborough County, 695 So.2d 672 (Fla.1997); Northern Palm Beach County Water Control Dist. v. State, 604 So.2d 440 (Fla. 1992); Taylor v. Lee County, 498 So.2d 424 (Fla.1986). To comply with the requirements of the law, a special assessment funding a bond issuance must satisfy the following two-prong test: (1) the property burdened by the assessment must derive a special benefit from the service provided by the assessment; and (2) the assessment for the services must be properly apportioned among the properties receiving the benefit. See Lake County v. Water Oak Management Corp., 695 So.2d 667, 668 (Fla.1997) (citing City of Boca Raton v. State, 595 So.2d 25, 30 (Fla. 1992)).[2] "[T]he standard [of review] is the same for both prongs; that is, the legislative determination as to the existence of special benefits and as to the apportionment of the costs of those benefits should be upheld unless the determination is arbitrary." Sarasota County v. Sarasota Church of Christ, 667 So.2d 180, 184 (Fla. 1995).[3]
*258 In this case, however, the City's legislative finding that the special assessment confers a special benefit upon the land burdened by the assessment was not arbitrary and, therefore, was entitled to a presumption of correctness by the trial court. By substituting its own judgment for that of the locally elected officials, and thus failing to attach a presumption of correctness to the legislative determination, the trial court erred as a matter of law.
Validation Opponents argue there is no evidence to support the City's conclusion that the improvements will provide a special benefit to all tax parcels located within the District. Section 1.03(E) of City Resolution 99-884, however, provides the City's specific findings regarding the "special benefits" derived from the improvements:
The Tuscawilla Improvements will provide a special benefit to all Tax Parcels located within the Tuscawilla Improvement Area ... by improving and enhancing the exterior subdivision boundaries, the interior subdivision areas, the subdivision identity, and the subdivision aesthetics and safety, thus enhancing the value, use and enjoyment of such property.

City of Winter Springs, Fla., Resolution No. 99-884 (July 12, 1999) (emphasis added). Moreover, the City did employ the services of an outside consultant and appraiser to specifically "analyze whether or not such improvements would have a beneficial impact on home values in the general area." Letter from Appraiser to City of Winter Springs (April 10, 1998). After evaluating the nature, and area, of the proposed improvements, the property appraiser concluded that there would be a beneficial impact on overall property values in the area:
[W]e reviewed numerous subdivisions and PUDS ... [and] had discussions with residential appraisers, developers, and Realtors regarding beautification projects, either in place or proposed, so that we might have an insight into market opinion on this issue. From this analysis, it was concluded that having improvements, such as those proposed for the Tuscawilla PUD and described to us, in place enhances the market perception of the area and, ultimately, the surrounding property values within the development.... There appears to be a positive and certain influence on the market value for properties in areas where such improvements are made.
Id. In addition, during the validation hearing, the appraiser provided uncontroverted testimony regarding the special benefit conferred upon properties in the District:
Q. [City Counsel] Now, Mr. Robbins, what did you, based on your investigation and your work in this project, what was your opinion in terms of what these improvements would have on the value of property, beneficial value of this property in the assessment area.

*259 A. [Appraiser] I concluded that there would be a positive, general overall benefit to the surrounding properties.
Q. [City Counsel] Could you tell the Court basically why you felt that.
A. [Appraiser] It was from my discussions with the developers, residential appraisers, and realtors, and engaging them in a discussion about what the impact of these types of improvements generally have on, or what their perception of those impacts are. And to see every person that I discussed this matter they conveyed to me for various reasons it would have a positive overall impact on those surrounding homes.
Validation opponents also argue that because other people outside of the District may benefit from the improvements, the improvements do not confer a "special" benefit upon property owners in the District. This argument fails, however, because the mere fact that the opponents presented testimony that non-neighborhood residents drive through the District on their way to other parts of the City, and en route will incidentally benefit from improvements in the District such as new signs, landscaping and street lighting, does not invalidate the special assessment. See Charlotte County v. Fiske, 350 So.2d 578, 581 (Fla. 2d DCA 1977) (holding that a special benefit is not lost merely because other properties incidentally benefit); see also Lake County, 695 So.2d at 670 (holding that a special benefit can only be conferred to the real property itself, i.e., not to mere passersby).
This Court has held that "if reasonable persons may differ as to whether the land assessed was benefitted by the local improvement, the findings of the city officials must be sustained." City of Boca Raton v. State, 595 So.2d 25, 30 (Fla.1992). Accordingly, the trial court failed to give appropriate deference to the legislative findings of the City and to the record evidence that provided support for those findings. The specific findings of the City Commission declare that the assessment for the District would improve exterior subdivision boundaries, interior subdivision areas, subdivision identity and subdivision aesthetics, and would enhance the safety, value, and the use and enjoyment of all properties within the District. These findings are supported by the analysis and testimony of the City's appraiser, who was specifically employed to address the benefit question. Moreover, Validation Opponents adduced no evidence to counter these legislative findings. Without any evidence or rational basis to overcome the presumption of correctness which attends the City's legislative findings, there can be no invalidation of the bonds.[4]
The second prong of the special assessment test established in City of Boca Raton requires that the assessment be fairly and reasonably apportioned among the properties that receive the special benefit. See City of Boca Raton, 595 So.2d at 29. And though a court may recognize valid alternative methods of apportionment, so long as the legislative determination by the City is not arbitrary, a court should not substitute its judgment for that of the local legislative body. See Sarasota Church of Christ, Inc., 667 So.2d at 184; see also Harris v. Wilson, 693 So.2d 945, 947 (Fla.1997); State v. Sarasota County, 693 So.2d 546, 548 (Fla.1997).
The City's method for apportioning the costs of the proposed improvements *260 was thoughtfully selected to assure equitable treatment to every land owner in the District. Through its Resolution 99-884, the City provided the framework for apportionment of the beautification assessment to be "substantially proportional to the area of Buildings located [within the District]." City of Winter Springs, Fla., Resolution 99-884 § 1.03(F) (July 12, 1999). Inasmuch as the District contains single-family homes, multifamily buildings, and a few commercial properties, the City first sought to determine whether all three property uses would benefit from the proposed improvements on the same basis. It determined they would not, as its consultant testified at the trial:
[W]e know for a fact from analysis that single-family [residences] produce[ ] a different impact on the road system and the community as more than say multifamily condos or apartments, that there's a different benefit realized.
The City then analyzed the mix of properties within the District to find an appropriate basis for assessing the different property uses equitably. It determined that the average square footage of each single-family dwelling unit in the District the vastly predominant form of property usewas 2200 square feet. It then created a formula that assigned each single-family home an "equivalent residential unit" value of 1, and it extrapolated the ERU value to the multifamily dwelling units and to the commercial properties in the District based on square footage. It then determined that vacant parcels would pay the same as a single-family dwelling unit, and that commercial property would in no event be assessed less than a single-family home. This method, the City Commission found, had the effect of "fairly and reasonably allocating the cost to specially benefitted property, based upon the number of ERUs attributable to each benefitted property in the manner hereinafter described."[5] City Resolution 99-884 § 1.03(G).
Moreover, there was testimony by the City Manager at the validation hearing that nearly all property owners in the District use the Winter Springs Boulevard entry for access to their property:
The majority of people and to some degree I would say every individual that lives in the district is going to use that road.
The City also brought forward expert witness testimony that the location of any particular properties in relation to the improvements was not an appropriate factor for allocation, because
the main benefit of the improvements... was to provide an enhanced identity to the community, safety, and landscaping. All of those are the types of benefits that in our professional opinion spread equally throughout the entire community.
This testimony was bolstered by the expert's observation on cross-examination that "[t]he other enhancements, such as street lights, which enhance[ ] the safety of the community ... are equally enjoyed also by everybody in that community."
Though a court, like Validation Opponents, might envision alternative apportionment schemes (e.g., based upon square footage of each particular home, or the proximity of a property in relation to each of the proposed improvements, or even based in some part upon studied usage of various roadways), the choice of apportioning assessments by one or another methodology is not for this Courtor even Validation Opponents.[6] Rather, it is a *261 City responsibility in the first instance which must be upheld if not arbitrary. See Sarasota Church of Christ, 667 So.2d at 184.[7]
Moreover, a mere disagreement of experts as to the choice of methodology is legally inconsequential. See Rosche v. City of Hollywood, 55 So.2d 909, 913 (Fla. 1952) ("If the evidence as to benefits is conflicting and depends upon the judgment of witnesses, the findings of the City Commission will not be disturbed."). In fact, the validation opponents' expert witness recognized that his opinion on methodology did not invalidate the one selected by the City:
Q. [City Counsel] Are you saying that these assessments are invalid?
A. [Opponents Expert] No. I'm not saying that any assessment is invalid. It happens all the time. I'm just saying that this particular assessment with four thousand plus homes was not treated properly, in my opinion. I concluded that there would be a positive, general overall benefit to the surrounding properties.
As this Court noted in City of Fort Myers v. State, 95 Fla. 704, 117 So. 97, 104 (1928), however, "[n]o system of appraising benefits or assessing costs has yet been devised that is not open to some criticism." Rather, a host of elements enter into the proration of benefits, including:
[P]hysical condition, nearness to or remoteness from residential and business districts, desirability for residential or commercial purposes, and many other peculiar to the locality where the lands improved are located.
Meyer v. City of Oakland Park, 219 So.2d 417, 419-20 (Fla.1969). The "Equivalent Residential Unit" ("ERU") method of apportioning based upon average building square footage of single family and multifamily residences was reasonable. There is no requirement to "tier" assessments based on proximity to the improvement, nor is there any requirement to value the benefit on each individual property within the District.
Even an unpopular decision, when made correctly, must be upheld. A review of the record in this case yields competent, substantial evidence to support the City's determination of apportionment and, therefore, the City's findings regarding apportionment cannot be said to be "arbitrary." Rather, in this instance, the City's findings are entitled to a presumption of *262 correctness, and the trial court erred as a matter of law in substituting its judgment for that of the locally-elected officials.
Therefore, the judgment of the trial court appealed from is reversed, and the cause remanded for further bond validation proceedings consistent with this opinion.
It is so ordered.
WELLS, C.J., and SHAW, ANSTEAD, PARIENTE, LEWIS and QUINCE, JJ., concur.
NOTES
[1] Tuscawilla is a Planned Unit Development located within the City, consisting of a number of different independent developments with approximately four thousand homes, a county club and golf course, and several commercial properties. In the early 1990's, a group of Tuscawilla homeowners approached the City requesting authority to form a taxing district for the maintenance and improvement of certain common areas within Tuscawilla no longer being maintained by the developer.
[2] In this case, it was conceded that the City had the authority to issue the bonds, and there was no suggestion that the purposes for issuance of the bonds were not entirely proper. Rather, the City's purpose for the bonds is well-recognized as a basis for special assessments. See, e.g., section § 170.01(1), Fla. Stat. (1999) (authorizing municipalities to impose special assessments to fund "related lighting, landscaping, street furniture, signage, and other amenities as determined by the governing authority of the municipality").
[3] This Court has employed the same "special benefits" test to analyze the validity of special assessments in the context of bond validation cases, see, e.g., Collier County v. State, 733 So.2d 1012 (Fla.1999) (affirming trial court's invalidation of revenue certificates because assessment did not satisfy the first prong of the "special benefit" test); State v. Sarasota County, 693 So.2d 546 (Fla.1997) (affirming trial court's judgment validating proposed bonds issued for purpose of funding stormwater management program because assessment met both prongs of "special benefit" test); City of Boca Raton v. State, 595 So.2d 25 (Fla.1992) (reversing trial court's invalidation of special assessment improvement bonds to improve downtown infrastructure because special assessment met both prongs of "special benefit" test), and "non-bond validation" cases where municipalities have attempted to utilize "special assessments" (in lieu of ad valorem taxes) to finance specific improvements or services. See, e.g., Lake County v. Water Oak Mgt. Corp., 695 So.2d 667 (Fla. 1997) (holding that fire protection services funded by county's special assessment specially benefitted real property in county); Harris v. Wilson, 693 So.2d 945 (Fla.1997) (affirming validation of special assessment for solid waste disposal facility); Sarasota County v. Sarasota Church of Christ, Inc., 667 So.2d 180 (Fla.1995) (holding that special assessment for stormwater services is a valid special assessment).
[4] Further, this Court has stated that, "[i]n evaluating whether a special benefit is conferred to property ... the test is whether there is a `logical relationship' between the services provided and the benefit to real property." Lake County v. Water Oak Mgt. Corp., 695 So.2d 667, 669 (Fla.1997) (citing Whisnant v. Stringfellow, 50 So.2d 885 (Fla.1951), and Crowder v. Phillips, 146 Fla. 440, 1 So.2d 629 (1941) (on rehearing)). Here, it is not unreasonable to conclude that there is a "logical relationship" between the proposed beautification and lighting enhancements within the District and the special benefit of enhancing the values of individual properties situated therein.
[5] The City's assessment methodologyusing Equivalent Residential Unitsfinds direct support in Rushfeldt v. Metropolitan Dade County, 630 So.2d 643 (Fla. 3d DCA 1994), review denied, 639 So.2d 980 (Fla.1994). There the court upheld "the propriety of the unit method utilized for the special assessments" imposed in the taxing district. Id. at 645 (quoting trial court's Final Summary Judgment).
[6] It should be noted, however, that in Rushfeldt v. Metropolitan Dade County, 630 So.2d 643 (Fla. 3d DCA 1994), the court addressed a contention from property owners that fair apportionment required a different assessment for residents close to and remote from guard gate improvements and guard services in a gated neighborhood. The court categorically rejected that contention, holding there is no requirement for "tiered assessments based on a property's proximity to the entrance," and that distinction being suggested between residents in the neighborhood "could make it impossible to ever create a special taxing district." Rushfeldt, 630 So.2d at 645 (quoting trial court's judgment). The Rushfeldt decision is particularly pertinent here, because the court there sustained the very same improvements which are at issue herestreet lights, landscaped green areas, and better roads. Id. To the same effect is Northern Palm Beach County Water Control District v. State, 604 So.2d 440 (Fla.1992), which also upheld special assessments for signs, landscaping, irrigation, and street lighting in a mixed-use community with more than 2000 residential properties.
[7] In Cape Development Co. v. City of Cocoa Beach, 192 So.2d 766, 771 (Fla.1966), this Court also held that benefits need not be determined by the City on the basis of a valuation of each individual dwelling unit. In this case, the Court addressed a contention that a valid assessment required the City to "have each parcel of land affected show a dollar and cents comparison of benefits derived to assessment[.]" Id. The Court saw no merit in that contention, pointing out:

There are over a thousand parcels of property affected in this improvement project, and to require a municipality to itemize and set forth opposite each parcel the amount in dollars said parcel would benefit from said improvements is unduly tedious and beyond the requirements....
Id. at 773. As noted above, the Tuscawilla Beautification District has over 4000 residential unit parcels, which would prove even more tedious to itemize.