PARIENTE, J.
This case is before the Court on appeal from a circuit court judgment validating two bond issuances proposed by the City of Marco Island. We have jurisdiction. See art. V, § 3(b)(2), Fla. Const.; § 75.08, Fla. Stat. (2006). The purpose of the bonds is to finance the expansion of the City’s wastewater collection and treatment system in order to provide wastewater collection and treatment for users not currently served by the system. The sole *205 issue raised in this appeal is whether the special assessments, which will be used to pay the debt service on the two bond issuances, are equitably apportioned when imposed only on new users rather than on all users of the system. Because the expansion of the wastewater treatment and collection system confers a special benefit on the new users, the special assessments are not arbitrary or inequitable. Accordingly, we conclude that the bond issuances comply with the requirements of law and affirm the trial court’s judgment validating the bonds.
BACKGROUND
The City of Marco Island (City) acquired the utility assets located on Marco Island in 2003 and thereafter embarked on a study to create a ten-year utility master plan for expansion of the wastewater collection and treatment system. The master plan recommended expansion of the waste-water utility system to all areas of the City where centralized sewer service is not available and properties are relying on septic tanks and cess pits. Under the master plan, expansion of capacity and construction of collection facilities are planned for the current wastewater treatment system. The capacity will be expanded from 3.5 million gallons to 5 million gallons and the wastewater collection system will be extended to accommodate the new users. The City estimated the cost of the project to be $38 million for all of the assessment districts within the City’s septic tank replacement program.[1] The City further estimated that the pro rata costs for the two districts in this first phase of the expansion project would be $1,500,000 for the South Barfield district and $3,500,000 for the Tigertail district.
In order to fund the initial phase of the expansion, the City proposed two non-ad valorem revenue bond issuances, identified as “not to exceed $1,500,000 Special Assessment Revenue Bond, Series 2006” and “not to exceed $3,500,000 Special Assessment Revenue Bond, Series 2006.” The revenue bonds were proposed to fund the phased construction costs for extension of the City’s wastewater collection and transmission facilities and the expansion of wastewater treatment capacity. Debt service on the bonds will be paid with revenue received from special assessments from the two districts.
These proposed bond issuances were the result of the City’s adoption of a series of assessment and bond resolutions.[2] After public hearings, the City determined that new users in both the South Barfield and the Tigertail districts will fund their proportionate share of the extension of the collection improvements and the expansion of capacity in the existing facility through special assessments,[3] which will in turn *206 pay debt service on the two bond issu-ances. The bond resolutions expressly pledge the assessments for the repayment of the bonds and mandate that the proceeds of the bond issuances be deposited into a project fund to be used to pay the project costs described in the assessment resolutions.
The City sought circuit court validation of these special assessment bonds. Citizens Advocating Responsible Environmental Solutions, Inc., and Douglas Enman and Frances Enman (collectively, “Citizens”) challenged the validity of the bond issuances, primarily arguing that the special assessments upon new users of the system were arbitrary and not equitably apportioned because existing users, as well as the entire community, will benefit from expansion of the wastewater treatment system. Citizens also contended that existing users should be assessed for the project because the bond monies might be spent to make repairs and modifications to the wastewater treatment facility that would have been required even absent an expansion plan.
After a bench trial, during which extensive testimony was taken and documents were received into evidence, the trial court entered a final judgment finding the bond issuances valid and the assessments equitably apportioned.
ANALYSIS
This Court performs expedited review in bond validation cases to “facilitate[ ] an adjudication as to the validity of bonds so as to provide assurance of the marketability of the bonds.” City of Oldsmar v. State, 790 So.2d 1042, 1050 (Fla.2001). Our review authority in these cases is “circumscribed in scope and purpose,” id. at 1049, and is generally limited to three issues: (1) whether the public body has the authority to issue bonds; (2) whether the purpose of the obligation is legal; and (3) whether the bond issuance complies with the requirements of law. See Keys Citizens for Responsible Gov’t, Inc. v. Fla. Keys Aqueduct Auth., 795 So.2d 940, 944 (Fla.2001); State v. Osceola County, 752 So.2d 530, 533 (Fla.1999). However, where, as here, a bond issuance is funded by special assessments, we will apply an additional two-pronged test to evaluate whether those special assessments meet the requirements of the law. The Court in City of Winter Springs v. State, 776 So.2d 255 (Fla.2001), explained:
To comply with the requirements of the law, a special assessment funding a bond issuance must satisfy the following two-prong test: (1) the property burdened by the assessment must derive a special benefit from the service provided by the assessment; and (2) the assessment for the services must be properly apportioned among the properties receiving the benefit. See Lake County v. Water Oak Management Corp., 695 So.2d 667, 668 (Fla.1997) (citing City of Boca Raton v. State, 595 So.2d 25, 30 (Fla.1992)).
Id. at 257.
The trial court’s final judgment of validation comes to this Court clothed with a presumption of correctness. Osceola County, 752 So.2d at 533. We review the trial court’s factual findings for competent, substantial evidence and its conclusions of law de novo. City of Gainesville v. State, 863 So.2d 138, 143 (Fla.2003). The City’s legislative findings, namely that the service to be provided by the special assessment confers a special benefit on the land burdened by the assessment, and that the costs are properly apportioned among the properties receiving the benefit, are *207 also entitled to .a presumption of correctness and will be upheld unless the determination is arbitrary. See City of Winter Springs, 776 So.2d at 258; Sarasota County v. Sarasota Church of Christ, Inc., 667 So.2d 180, 184 (Fla.1995).
Citizens does not dispute the authority of the City to issue the bonds or the legality of the purpose of the bonds. Their challenge is directed to whether the special assessments that will pay debt service on the bond issuances comply with the requirements of law. Citizens’ main contention is that the assessments will be used to make needed improvements to the existing plant which are already required, and therefore existing users should also be assessed for those costs. 'There is no support for that proposition in the record.
The city council of the City of Marco Island made legislative findings based on the evidence before it that the properties to be assessed would be specially benefited by the collection and expansion project in various ways, which include: (a) providing a centralized means of collecting and disposing of treated wastewater in a manner that diminishes environmental burdens created by the current, less effective means of treating wastewater; (b) facilitating the development or redevelopment of the properties; (c) increasing the utility of properties by reducing the land needed for on-site sewage treatment facilities; and (d) accommodating increased demand for wastewater collection, treatment and disposal from individual properties.
Before adoption of the final assessment resolutions and the bond resolutions, the City had its assessment methodology reviewed by Public Resource Management Group (“PRMG”), an independent utility consultant. The report of PRMG contained the following conclusions:
We believe that the allocation of the Wastewater Treatment Capacity Improvements based on the proportionate capacity requirements of the parcels that are associated with the Assessment Program, is a reasonable basis to assign such capital cost to each parcel located within the Assessment Areas.
The principal author of the PRMG report also testified before the trial court that the new users would’ be specially benefited.
..The City’s Public Works Director and the City Manager testified that there would have been no reason to expand the capacity of the wastewater treatment plant beyond 3.5 million gallons if the City had not undertaken to expand the system to serve new users in the fifteen districts, and that the existing users would receive no special benefit from the expansion of the system.
Finally, the City’s use of the bond funds and the assessments is expressly limited to the wastewater treatment expansion and collection project. The City’s Finance Director testified that the costs attributable to the new users are coming from the assessments which will be used to pay debt service on the bonds. Section 3(c) of each bond resolution passed by the City for the Tigertail and South Barfield districts expressly provides that debt service on the bonds will be payable solely from the assessments. Section 8 of each bond resolution expressly pledges the assessments for payment of the bonds. The project to be funded by the bond revenues is expressly described in the assessment resolutions for both the Tigertail and South Barfield districts as wastewater treatment collection improvements for installation and construction of gravity lines, .force mains, pump or lift stations, and associated infrastructure necessary to service the assessment area. Wastewater treatment capacity improvements are defined to include facilities to transmit, receive, accommo *208 date, treat, and dispose of additional wastewater generated by new users and growth in the assessment areas. The bond covenants require use of the bond funds to construct these described projects and use of assessments to pay debt service on the bonds and, in this respect, clearly meet the requirements of the law.
Relying on Contractors & Builders Ass’n of Pinellas County v. City of Dunedin, 329 So.2d 314, 320-321 (Fla.1976), Citizens contends that allocation of assessments which distinguishes between existing users of the wastewater treatment facilities and the new users is arbitrary and illegal, thereby rendering the proposed bond issues invalid. In Contractors & Builders Ass’n, an ordinance establishing connection fees was invalidated on grounds unrelated to the issues in this appeal. However, in that decision, we addressed the principles underlying fair allocation of costs and fees for utility system improvements, in pertinent part, as follows:
In principle ... we see nothing wrong with transferring to the new user of a municipally owned water or sewer system a fair share of the costs new use of the system involves.
[[Image here]]
The cost of new facilities should be borne by new users to the extent new use requires new facilities, but only to that extent. When new facilities must be built in any event, looking only to new users for necessary capital gives old users a windfall at the expense of new users.
Id. at 317-18, 321. We observed that imposing fees only upon the properties to be served “which do not exceed a pro rata share of reasonably anticipated costs of expansion, is permissible where expansion is reasonably required, if use of the money collected is limited to meeting the costs of expansion.” Id. at 320.
In this case, the City’s expert witnesses and City officials testified that the new users in these two districts will be assessed only a pro rata share of the total costs of extending the wastewater collection facilities and expanding the treatment capacity of the plant from 3.5 million gallons to 5 million gallons. Competent, substantial evidence was presented that expansion was reasonably required and that those assessed would receive special benefits solely based upon the new wastewater treatment capacity expansion and extension of the collection facilities to their properties. Thus, Contractors & Builders Ass’n does not support Citizens’ argument.
A more analogous case is Murphy v. City of Port St. Lucie, 666 So.2d 879 (Fla.1995), a bond validation proceeding involving special assessments for expansion of water and sewer lines to designated areas not previously served. There, the challenger argued that the utility expansion was part of a city-wide program intended to confer a community-wide benefit to all the citizens of Port St. Lucie and that the benefit received by the specially assessed properties was only incidental to the benefits conferred on the community as a whole. We concluded, however, that the special assessment was proper precisely because the city was “only assessing the properties that will be connected to the water and sewer system” and the “property owners presently ... on-line with the system ... will not be benefited by the extension.” Id. at 881. The same conclusion applies to the special assessments in this case.
Citizens also contends, as did the challenger in Murphy, that the special assessments are not equitably apportioned to new users because the expansion of the wastewater treatment plant and extension *209 of the system to new users will benefit the entire community. This contention is not supported by the record. The City presented competent, substantial evidence through expert witnesses and reports, and by testimony of City officials, that the new users of the expanded wastewater treatment system will be specially benefited by inclusion in the central wastewater collection and treatment system beyond any generalized benefit to the community as a whole. The fact that an entire community might receive a collateral or incidental benefit from new users being connected to a sanitary sewer system does not negate the evidence presented below that new users will specially benefit by virtue of their inclusion in the extended and expanded central wastewater system.
Lastly, Citizens challenges as speculative the City’s plan to fund future improvements to the existing facility that are unrelated to expansion of the system through a general rate base increase to be paid by all users. Questions concerning any future funding plan for improvements to the existing facility not necessitated by the expansion to serve additional users and not related to these proposed bond issu-ances are not before us at this time and are expressly outside the jurisdiction of this Court when reviewing bond validation proceedings. See Murphy, 666 So.2d at 880.
CONCLUSION
Competent, substantial evidence before both the city council and the trial court supports a finding that the improvements to expand capacity and treatment facilities and to provide for wastewater collection from new users will confer a special benefit on the new users. Because we conclude that the City acted within its authority and complied with the requirements of the law in issuing the South Barfield not to exceed $1,500,000 Special Assessment Revenue Bond, Series 2006 and the Tigertail not to exceed $8,500,000 Special Assessment Revenue Bond, Series 2006, the trial court’s final judgment validating the bonds and the special assessments’is affirmed.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, QUINCE, CANTERO, and BELL, JJ., concur.

. When these bond issuances were proposed, the plan involved a total of fifteen assessment districts.

. Marco Island, Fla., Resolution No. 05-38 (June 20, 2005) (South Barfield Initial Assessment Resolution); Marco Island, Fla., Resolution No. 05-39 (June 20, 2005) (Tigertail Initial Assessment Resolution); Marco Island, Fla., Resolution No. 05-54 (August 1, 2005) (South Barfield Final Assessment Resolution); Marco Island, Fla., Resolution No. 05-53 (August 1, 2005) (Tigertail Final Assessment Resolution); Marco Island, Fla., Resolution No. 05-70 (October 17, 2005) (South Barfield Bond Resolution); Marco Island, Fla., Resolution No. 05-72 (October 17, 2005) (Tigertail Bond Resolution); and Marco Island, Fla., Resolution No. 05-69 (October 17, 2005) (Intent Resolution setting forth the City’s intent to collect the assessments under the uniform method of collecting non-ad valorem assessments as authorized by section 197.3632, Florida Statutes (2005)).

.The City provided for levying the special assessments by its assessment ordinance. *206 Marco Island, Fla., Code §§ 2-281 to 2-379 (2000).