GROSS, C.J.
This appeal concerns a special assessment the City of Boynton Beach imposed on all improved property within city limits to fund its integrated fire rescue department. Desiderio Corporation, Ewell Mil *489 ler, and Sir Electric, Inc., property owners in Boynton Beach, filed suit to challenge the special assessment. They sought a declaration that the assessment was unlawful and an injunction preventing the City from billing or collecting it. After a three-day, non-jury trial, the judge concluded that the special assessment was valid.
The property owners appeal from that final judgment. They attack the special assessment on the following grounds: (1) the assessment was for services that did not specially benefit the burdened properties; (2) the City’s apportionment methodology was arbitrary; and (3) the City im-permissibly spent the assessment funds on unauthorized services and capital projects. We affirm the final judgment as to each argument.

Facts

The City’s fire department was an integrated fire rescue and emergency medical services program. The firefighters were “cross-trained,” which means they “can provide firefighter duties and emergency medical services duties,” with an “apparatus that can support both functions.” Each firefighter is either an EMT or a paramedic.
In 2000, the City Commission determined that the fire department’s infrastructure should be improved. The Commission decided to fund improvements through a special assessment against real property. To develop the assessment, the City hired Government Services Group, Inc. (“GSG”), a consulting group that specialized in advising local governments on alternative revenue sources, such as special assessments. Camille Tharpe, a GSG senior vice president, had primary responsibility for overseeing the special assessment project. She testified at trial on what GSG did to develop the assessment at issue in this case.
After the City provided Tharpe with a list of objectives, GSG collected data to formulate a methodology for the assessment. From the City, she received much information on the resources and operations of the fire department. GSG staff visited each of the City’s stations, evaluated the premises and equipment of each, and looked at the surrounding neighborhoods to determine the kinds of properties the stations were servicing. From the property appraiser, Tharpe received tax records for properties within the City. GSG also collected fire incident data from the Florida Fire Incident Reporting System (FFIRS), which was maintained by the State Fire Marshal.
In a report delivered in June, 2001, GSG outlined a proposed special assessment and described the methodology used to arrive at it. GSG acknowledged that any special assessment would have to comply with this court’s decision in SMM Properties, Inc. v. City of North Lauderdale, 760 So.2d 998 (Fla. 4th DCA 2000). In that case, this court held that the EMS portion of an integrated fire rescue program did not provide the special benefit to property required for a special assessment. Thus, GSG advised the City to exclude the cost of EMS services from the special assessment.
The City’s fire department had one budget, which did not distinguish between money going toward fire protection services and money going toward emergency medical services. GSG developed a complicated methodology to determine which department costs were for fire protection services and which were for EMS. Tharpe did this to “allocate[] the costs of [each] line item” in the program’s 2000-2001 adopted budget. What made that allocation difficult was the integrated nature of the program, where some line items were used for both fire protection services and *490 EMS. Tharpe looked beyond the line items to the “back up information” describing “the different purchases they were going to be making [with] ... those line items.” Accordingly, Tharpe developed a methodology with 3 factors that could be applied to properly allocate the cost of each line item.
The first factor was direct allocation. Sometimes, a line item was devoted entirely to either fire protection services or EMS. In those cases, allocation was easy. For example, “[b]unker gear” is used only for fire protection services, so the entire cost of that line item was allocated to fire protection services, and not EMS. In contrast, “[t]he medical director ... is a requirement to provide EMS services, so the medical director is 100 percent EMS.”
The second factor was based on administrative functions, or how personnel spent their time. Tharpe developed this factor in response to the line items for which she could not allocate the entire cost to either fire protection services or EMS. This “administrative factor” was based on how personnel were assigned during their shifts. According to the city manager, firefighters worked 24-hour shifts, with 22 firefighters working each shift. Out of those 22, 13 were assigned to fire vehicles and 9 were assigned to EMS vehicles. Consequently, in any 24-hour shift, firefighters spent 59.09% of their time “in non-EMS related activities.” Tharpe applied the administrative factor’s percentage to “mixed” line items to identify the EMS portion of the cost.
The third factor in GSG’s methodology was the “operational factor.” As opposed to the administrative factor, which described how personnel .spent their time, the operational factor was “applied to those line items that are more related to the number of calls that you’re making.” For example, if 80% of the calls dispatch received were for EMS, then 80% of the dispatch costs should be EMS-related. Another application of the operational factor was to vehicle maintenance: Tharpe explained that “if you don’t have good data regarding [ ] maintenance of your vehicles and 80 percent of your calls are EMS calls, [] probably 80 percent of your maintenance costs should be EMS costs.”
Similar to the administrative factor, Tharpe computed a percentage for the operational factor. Based on the data it had compiled, GSG concluded that, in 2000, the fire department responded to 9,673 incidents. GSG then weeded out the calls to cities that had contracted with the City for services, resulting in a total number of 9,251 calls. GSG then filtered out calls it designated EMS incidents.
How Tharpe sorted EMS from non-EMS calls is a point of contention in this appeal. In Florida, fire departments use the FFIRS to classify by codes the worst situation they find upon arrival at a scene. Tharpe obtained an electronic database of the City’s situation found code data. A printout of the Excel database, which contained a line for each incident the department responded to in 2000, was admitted at trial. Tharpe did not receive printouts of individual incident reports.
The City defined EMS, and thus the codes to be excluded from the special assessment funding, as rescue call (insufficient information); inhalator call; emergency medical call; search; and water rescue. The FFIRS Coding Guide defined emergency rescue calls as including “checking for injuries, treatment for shock, and the like.” Tharpe testified that these EMS calls amounted to 5,254, or 56.79%, of those calls. That left 3,997 non-EMS calls, or 43.21%, which was the percentage used for the operational factor.
*491 At trial and on appeal, appellants attack the inclusion of certain non-EMS codes in the special assessment, arguing that those specific codes represent services that do not benefit property. They did not offer much evidence on this point, however. Appellants called Chief William Bingham as a witness during their case-in-chief. They took Bingham through almost every contested code during his testimony, asking whether that code benefitted real property. Bingham thought some codes did or might benefit property, such as removing people from elevators or water ¿vacuation;[1] he indicated that some codes might not or did not benefit real property, such as removing people from vehicles, responding to vehicle accidents, and calls canceled en-route; and he said that he did not have enough information to analyze the benefit to property provided by other codes, such as vehicle fires, lock-outs, animal rescue, and assisting police.
Once Tharpe arrived at the three factors of her methodology, she applied them, or a combination of them, to each line item in the fire department’s budget. She detailed the results in a chart that demonstrated which factor or factors she applied to each line item. • For example, Tharpe applied the administrative factor to regular salaries and wages to isolate an amount directly related to fire services.
In the end, Tharpe arrived at a “fully assessable budget” of $5,240,290, which was the 65% of the department’s budget that she determined was spent on fire protection services.
After pinpointing the assessable portion of the department’s budget, Tharpe established a methodology for apportioning the assessment among the properties to be levied. She relied on the City’s FFIRS data (fixed property codes), explaining that those “property uses correlate very well to the building codes and the property use codes on the tax roll.” Consequently, she was able to “count the number of incidents by the different types of fixed property used [sic] codes.”
Tharpe- grouped the non-EMS calls into 6 property categories, and reduced each category’s share to a percentage of the whole. The single-family residential category used 33.62% of the fire protection services for that year; multi-family residential, 24.65%; commercial, 22.47%; industrial/warehouse, 3.16%; institutional, 8.26%; and nursing home, 7.84%. Tharpe treated nursing homes as a different category because the City had a “significant number of incidents to nursing homes,” even though the City did not have “a whole lot of nursing homes.” Thus, including nursing homes in the institutional category would force those institutional properties to “pay a disproportionate share of their cost.” She felt that “the categories [they] created met [a] fair and reasonable!]” standard.
For non-residential properties, Tharpe reviewed the tax roll information she had received from Palm Beach County, but discovered that the square footage listed in the rolls was not accurate enough. Thus, Tharpe determined not to use exact square footage in the apportionment methodology for non-residential properties. Instead, she used a tier system that found support in the National Fire Protection Association literature on “how much fire flow is needed for putting out structure fires.” Tharpe capped the assessable square footage for. nonresidential properties at 50,000. *492 This cap reflected the firefighting capacity of the department. Finally, each category and subcategory was assigned a specific dollar rate.
Ultimately, Tharpe concluded that the City’s special assessment “meets the special benefit and fair and reasonable apportionment case law criteria.” The city manager testified that “the methodology ... reflected in [his] view a system of assessment that was fair and reasonable.”
The City approved the methodology and moved ahead with the preparation of an enabling ordinance and a preliminary rate resolution. The City held a series of meetings on the special assessment. The City passed the enabling ordinance in July, 2001. In the Fire Rescue Assessment Ordinance, the City determined that “the fire rescue services, facilities, and programs” possessed a logical relationship to the benefit provided to real property by “protecting the value of the improvements,” “protecting the life and safety of intended occupants,” “lowering the cost of fire insurance,” and preventing fires on vacant property from spreading to improved property.
Also, in July, 2001, the City adopted the Initial Assessment Resolution, in which the City “ratified and confirmed” the legislative determinations it had made in the Ordinance. The resolution contained the special assessment methodology, described above. In its Final Assessment Resolution, the City determined that each burdened property specially benefited from the funded services and incorporated the findings from the Ordinance and initial Resolution.
The amount of the special assessment set by the city was $3,369,656. This was 64.3% of the “fully assessable budget” ($5,240,290) determined by GSG. The City levied the special assessment annually until 2008. In fiscal year 2001-2002, the City collected $2,306,269 through the special assessment. In the years the assessment was in effect, the City took in a total of $18,199,650. During those same years, the cost of running the integrated fire/EMS program was approximately $82,000,000. The special assessment funded about 22% of the total costs of the City’s fire rescue system.
When the City collected money from the special assessment, it was deposited in the same bank account as the City’s other revenue funds. Within the bank account, the City segregated the funds from others by assigning each kind of fund a number. The special assessment fund’s number was 305. Other than the fire chiefs and the deputy fire chiefs judgment, there were no controls in place to ensure that the special assessment funds were used for fire protection services but not for EMS.
During the trial, appellants demonstrated that the department made certain expenditures from the assessment fund. The City hired 24 new firefighters and purchased a new fire truck using special assessment money. The City also constructed a new station house, and renovated another, using money from the assessment fund. Additionally, money from the special assessment was used to purchase land for a new station house.
In an amended final judgment, the circuit judge ruled in favor of the City on all counts. The court first found that appellants “failed to meet their burden of proof by failing to demonstrate that any of the [City]’s legislative findings of special benefit, or any portion of the methodology, including the methodology used to segregate EMS from the remaining services provided by the City’s integrated fire rescue department is arbitrary.” The court found that Tharpe’s testimony supported the City’s legislative determinations.
*493 The judge concluded that appellants’ approach to special assessments, focusing on individual calls, “would require the City’s consultants and staff, then the City Commission at the time of enactment, then a court when reviewing the special assessment, to review each of the thousands of calls for services to confirm there was a logical relationship between each individual call and a benefit to real property.” Appellants’ methodology, the judge wrote, “would require unnecessary and improper judicial intrusion into the municipal legislative process of special assessments^] imposing improper judicial micromanaging of special assessment methodologies.”
Next, the judge determined that the City’s method of apportionment was not arbitrary. He held that the City reasonably relied on square footage tiers, rather than exact numbers for each property. He also found that the City’s cap for nonresidential properties was reasonable.
Finally, the judge rejected appellants’ argument that no portion of an integrated fire rescue program, funded in part by a special assessment, could be spent on EMS. He wrote, “The very essence of integrated fire rescue services is that cross-trained personnel and their vehicle[s] and equipment are used to provide both traditional fire services and EMS.”

Background on the Law of Special Assessments

Local governments have no “authority to levy taxes, other than ad valo-rem taxes, except as provided by general law.” Collier County v. State, 733 So.2d 1012, 1014 (Fla.1999). Those governments do, however, “possess authority to impose special assessments and user fees.” Id. Different from a tax, a special assessment
is imposed upon the theory that that portion of the community which is required to bear it receives some special or peculiar benefit in the enhancement of value of the property against which it is imposed as a result of the improvement made with the proceeds of the special assessment.
Klemm v. Davenport, 100 Fla. 627, 129 So. 904, 907 (1930).
Much litigation in Florida has focused on whether an assessment qualifies as a proper special assessment. To be considered a valid special assessment, an assessment must satisfy a two-prong test: first, “the property burdened by the assessment must derive a ‘special benefit’ from the service provided by the assessment” and second, “the assessment for the services must be properly apportioned.” Collier County, 733 So.2d at 1017 (citing Lake County v. Water Oak Mgmt. Corp., 695 So.2d 667, 669 (Fla.1997)). The touchstone .for a special benefit is “whether there is a ‘logical relationship’ between the services provided and the benefit to real property.” Lake County, 695 So.2d at 669.
A court’s review of a special assessment is deferential, since “[n]o system of appraising benefits or assessing costs has yet been devised that is not open to some criticism.” S. Trail Fire Control Dist., Sarasota County v. State, 273 So.2d 380, 383 (Fla.1973) (quoting City of Fort Myers v. State, 95 Fla. 704, 117 So. 97, 104 (1928)). During judicial review, “the standard is the same for both prongs [of the special benefits test]; that is, the legislative determination as to the existence of special benefits and as to the apportionment of the costs of those benefits should be upheld unless the determination is arbitrary.” Sarasota County v. Sarasota Church of Christ, Inc., 667 So.2d 180, 184 (Fla.1995).
Because the “two prongs both constitute questions of fact for a legislative body rather than the judiciary,” id. at 183, the arbitrariness standard essentially asks *494 whether the legislative body’s determinations are supported by competent, substantial evidence. See City of Boca Raton v. State, 595 So.2d 25, 30-31 (Fla.1992). If they are, the legislative determinations are entitled to a presumption of correctness. See City of Winter Springs v. State, 776 So.2d 255, 261-62 (Fla.2001).
To prevail in a challenge to a special assessment, “[t]he property owner has the burden to rebut the presumption of correctness ... and such presumption can be ‘overcome only by strong, direct, clear and positive proof.’ ” Workman Enters., Inc. v. Hernando County, 790 So.2d 598, 600 (Fla. 5th DCA 2001) (quoting City of Gainesville v. Seaboard Coastline R.R. Co., 411 So.2d 1339, 1340 (Fla. 1st DCA 1982)). If the property owner presents evidence rebutting the legislative findings, the findings lose the presumption. See City of Winter Springs, 776 So.2d at 259. When “a presumption of correctness does not attach to the City’s findings,” an appellate court adheres “to a standard of review of the lower court’s decision based on ordinary findings of fact.” City of N. Lauderdale v. SMM Props., Inc., 825 So.2d 343, 349 (Fla.2002).

The Services Funded by the Special Assessment Pass the “Special Benefit” Test

Appellants argue that the City’s special assessment is invalid, because the services the assessment was intended to fund did not provide a special benefit to the burdened property. We disagree. A presumption of correctness attached to the City’s findings of special benefit, and appellants did not produce sufficient countervailing evidence to overcome the presumption. Additionally, we disagree with appellants’ approach to analyzing the special benefit in this case.
Florida courts have long held that fire protection services provide a special benefit to real property burdened by an assessment. See, e.g., Fire Dist. No. 1 of Polk County v. Jenkins, 221 So.2d 740, 741-42 (Fla.1969). On the other hand, general sovereign functions, such as “(1) the Office of the Sheriff; (2) elections; (3) code enforcement; (4) courts and related agencies; (5) animal control; (6) libraries; (7) parks and recreation; (8) public health; (9) medical examiner; (10) public works; and (11) support services,” may not be funded by a special assessment. Collier County, 733 So.2d at 1016.
The analytical difficulty in this case arises because the fire department is integrated — it offers both fire protection services, which may be funded by a special assessment, and EMS services, which may not be funded by a special assessment. Two cases have considered the conundrum of funding an integrated fire/EMS department by a special assessment: SMM Properties, Inc. v. City of North Lauderdale, 760 So.2d 998, 1001-03 (Fla. 4th DCA 2000) (en banc), and the Supreme Court’s affirmance of that case, City of North Lauderdale v. SMM Properties, Inc., 825 So.2d 343 (Fla.2002).
In SMM Properties, this court was confronted with a city’s “integrated fire rescue program,” like the one in this case. An integrated program includes fire suppression, first-response medical aid, and EMS. SMM Props., Inc., 760 So.2d at 999. First-response medical aid “is considered one of the routine duties of a firefighter, and firefighters are required to take 40 hours of training of first response medical aid.” Id. at 1003. We explained that “[e]mergency medical service is a term of art used to define the systematic provision of services for assessment, treatment, and transportation of injured persons in medical emergencies.” Id. at 1000 n. 1 (citing *495 § 401.211, Fla. Stat. (1997)). The city’s firefighters were also paramedics, and they “responded] to all major medical calls.” Id. at 1000. The municipality levied a special assessment to fund the integrated program. The operative ordinance contained a finding that all of the services provided by the integrated department specially benefited the burdened property. Id. Property owners challenged the assessment, and the trial court granted partial summary judgment for the city on the special benefits prong. Id. The opponents appealed. Id.
This court held that, while fire protection services, including first-response medical aid, satisfied the special benefit test,[2] the EMS portion of the budget did not — in that it benefited “people, not property.” Id. at 1003-04. First, this court receded from “any suggestion” in City of Pembroke Pines v. McConaghey, 728 So.2d 347 (Fla. 4th DCA 1999), that Lake County prohibited a court from “separately analyz[ing] each of the services funded within an integrated fire services budget to insure that each component survives the required special benefits test.” SMM Properties, Inc., 760 So.2d at 1003. Then, this court proceeded to examine the EMS component of North Lauderdale’s integrated program.
We determined that the EMS component of the integrated program did not provide a “direct, special benefit to property owners.” Id. Such services, this court reasoned, “most appropriately come within the general police power services which the City provides to all city residents for their general benefit,” using the “general police power” distinction the supreme court found useful in Lake County and Collier County. Id. at 1003-04; see also Lake County, 695 So.2d at 670; Collier County, 733 So.2d at 1017-18. Additionally, we reviewed the city’s legislative determinations on special benefit and found them unsupported by the record, so that they were arbitrary. SMM Props., Inc., 760 So.2d at 1004.
Recognizing the significance of our holding that a municipality could not fund EMS with a special assessment, we certified to the Supreme Court the following questions as being of great public importance:
[Question 1] Do emergency medical services (EMS) provide a special benefit to property?
[Question 2] Can a fire rescue program funded by a special assessment use its equipment and personnel to provide emergency medical services for accidents and illnesses under Lake County v. Water Oak Management Corp., 695 So.2d 667 (Fla.1997)?
Id. at 1004 (emphasis removed).
In City of North Lauderdale, the Supreme Court answered both certified questions in the negative and approved this court’s decision in SMM Properties. The Supreme Court reviewed North Lauder-dale’s legislative determinations on special benefit and agreed with this court that there was no record evidence to support them. City of N. Lauderdale, 825 So.2d at 347-48. The Court highlighted a lack of studies, testimony, or expert opinion demonstrating that EMS specially benefitted real property. Id. at 348. Because “a legislative body ‘[... ] cannot by its fiat make a special benefit to sustain a special assessment where there is no special benefit,’ ” a presumption of correctness did not attach to the city’s legislative determinations. Id. (quoting S. Trail Fire Control *496 Dist. v. State, 273 So.2d 380, 383 (Fla.1973) (quoting 48 Am. Jur. Special or Local Assessments § 29, at 589 (1943))). Consequently, the court adhered “to a standard of review of the lower court’s decision based on ordinary findings of fact.” Id. at 349.
In the end, the Supreme Court held that “there is no logical relationship between emergency medical services ... and a special benefit to real property. Emergency medical services provide a personal benefit to individuals.” Id. at 350. Therefore, the Court determined that “the emergency medical services portion of the special assessment” had “the indicia of’ an unauthorized tax, “because it fail[ed) to provide a special benefit to real property.” Id.
Neither City of North Lauderdale nor SMM Properties forecloses the methodology used by the City in this case — to identify that portion of the integrated fire/EMS department budget devoted to fire protection services and then to fund a percentage of that portion with a special assessment.
Appellants’ approach to this case isolates certain “services” performed by the fire department, which they characterize as “non-EMS, non-fire protection services provided by a modern fire rescue department.” For appellants, each situation found code is a service. They then argue that these isolated services do not provide the special benefit to property that would allow their funding by a special assessment. The existing case law does not require this type of after-the-fact microan-alysis, as we explain in more detail below.
Here, the City made legislative determinations that the funded services specially benefitted the burdened property. In the Fire Rescue Assessment Ordinance, the City determined that “the fire rescue services, facilities, and programs” possessed a logical relationship to the benefit provided to real property by “protecting the value of the improvements,” “protecting the life and safety of intended occupants,” “lowering the cost of fire insurance,” and preventing fires on vacant property from spreading to improved property. The City “ratified and confirmed” these determinations in the Initial Assessment Resolution. In its Final Assessment Resolution, the City determined that each burdened property specially benefited from the services and incorporated the findings from the Ordinance and initial Resolution.
Unlike City of North Lauderdale, there is expert witness testimony in this case to support the City’s determinations. Tharpe’s testimony provided competent, substantial evidence to support these determinations. Although her approach to the special assessment did not use special benefit as its sorting criterion, Tharpe testified that her approach took into consideration this court’s decision in SMM Properties, and that she and GSG understood that the assessment had to specially benefit burdened property. Additionally, Chief Bingham testified that some of the contested codes represented activities that did benefit property.
Accordingly, a presumption of correctness attached to the City’s legislative determinations. Appellants failed to present “strong, direct, clear and positive proof’ that would overcome the presumption. The only evidence offered on this subject were Chief Bingham’s answers that some of the activities the fire department performed might not have benefited property, and equivocal answers regarding other codes. Appellants could have offered their own studies, testimony, or expert opinion demonstrating the activities did not specially benefit property, but they did not. See City of N. Lauderdale, 825 So.2d at 348. Appellants therefore failed to meet their burden.
*497 Further, we find three problems with appellants’ legal attack on the “special benefit” prong of the test required in a special assessment analysis under Lake County: (1) appellants use situation found codes as proxies for “services,” the focus of the case law; (2) appellants misunderstand the scope of “fire protection services;” and (3) appellants fail to appreciate that the City’s approach limited its risk to accusations of over-inclusiveness.
First, appellants treat situation found codes as a proxy for the services the fire department provides, and proceed to attack the City’s methodology by using those codes. However, the codes are descriptive. They represent an effort by the fire department to identify the types of situations to which it responds. While the codes are useful in determining how firefighters spend their time, their utility is less apparent when trying to evaluate the fire department’s services against the test required by the case law.
For example, there is a cost of maintaining a fire department that is not accurately reflected by the department’s responses to calls, as categorized by the codes appellants attack. But appellants’ analysis fails to recognize this. Thus, under appellants’ analysis, false and mistaken calls of various kinds, for which firefighters are not responsible, would fall outside assessable activities since no property was benefitted. However, responding to these types of calls is a necessary cost of running any fire department. If the department at issue was not integrated, providing only fire protection services, appellants would not be able to attack an assessment to fund it on the basis that the assessment incidentally funded false or mistaken calls.
Second, appellants’ narrow focus on each situation found code fails to recognize that the ease law allows many traditional fire department activities to be funded under the large umbrella of “fire protection services.” For example, the Supreme Court wrote that the following fell under that umbrella in Lake County: “fire suppression activities, first-response medical aid Lie., ‘initial medical care’], educational programs and inspections.” 695 So.2d at 668. The county’s fire department was also “involved in civil defense.” Id. at 669. Also, the department responded to “automobile and other accident scenes,” with “[f]ire services” being “provided to all individuals and property involved in such incidents.” Id. at 669. In SMM Properties, Inc., we observed that such services, “at first glance, would not seem to provide a special benefit to property.” 760 So.2d at 1002-03 n. 4. However, we opined that they could nonetheless specially benefit property because “an automobile crash or other accident, such as an explosion or chemical spill, could easily cause collateral destruction and damage to nearby property.” Id.
The case law allows for some flexibility in allowing special assessment funding of “services” that a fire department has traditionally provided in addition to the core fire suppression services. If educational programs and civil defense fall under the fire protection services umbrella, as in Lake County, we see no reason to exclude other traditional fire department services.
Finally, and significantly, the City took an approach that limited its risk of using the special assessment to fund services that did not benefit property. Using the methodology she developed, Tharpe determined that a “fully assessable budget” for fire protection services was 65% of the fire department’s budget, or $5,240,290. The City set the amount of the special assessment at $3,369,656, or 64.3% of the fully assessable budget. Thus, the City decided to fund only some of the portion of the fire department budget its expert identified as assessable. Even assuming that the City *498 failed to properly account for situation codes that did not benefit property, appellants did not demonstrate that “true” fire protection services consumed less than this level of the fire department’s funding. Consequently, appellants failed to carry their burden to show that non-assessable services were necessarily funded by special assessment funds.
For these reasons, we affirm the trial court’s holding that appellants failed to establish that the special asséssment funded services that did not specially benefit the property burdened by the assessment.

The Special Assessment’s Burden was Fairly and Reasonably Apportioned

We also reject appellants’ claim that the City’s apportionment methodology is arbitrary because the assessment burden on each property is disproportionate to the benefit received. Because we find the assessment was valid under the special benefits prong, we need not consider appellants’ specific argument that the inclusion of services they contested in that argument distorted the apportionment. In any case, the City’s apportionment methodology was not arbitrary.
Under the second prong of the special assessment analysis, “the assessment must be fairly and reasonably apportioned among the properties that receive the special benefit.” City of Boca Raton v. State, 595 So.2d 25, 29 (Fla.1992). “[T]hough,a court may recognize valid alternative methods of apportionment, so long as the legislative determination by the City is not arbitrary, a court should not substitute its judgment for that of the local legislative body.” City of Winter Springs v. State, 776 So.2d 255, 259 (Fla.2001) (citations omitted).
Courts have approved apportionment methodologies similar to the one used by the City in this case. First, courts in two cases have approved sorting properties into categories, as the City did here. In City of Winter Springs, the Supreme Court approved a “thoughtfully selected” methodology that aimed at assuring “equitable treatment to every land owner in the” assessment district. 776 So.2d at 259-60. The city categorized the properties as single-family homes, multifamily buildings, and commercial properties. Id. at 260. Then, the city created an “equivalent residential unit” based on the average square footage of a single-family home, assigning each such home an ERU value of 1. Id. Finally, the city “extrapolated the ERU value to the multifamily dwelling units and to the commercial properties in the District based on square footage.” Id.
In Workman Enterprises, Inc. v. Hernando County, 790 So.2d 598 (Fla. 5th DCA 2001), the court approved a similar apportionment methodology for an assessment to fund fire and rescue services. There, the county assigned each property into a different category, “each category having a different assessment rate.” Id. at 600. Categories were added or expanded and rates changed each year. Id. The county presented evidence supporting its methodology; the property owner “failed to present any evidence that the assessment was not fairly or reasonably apportioned among the property categories ... or that the burden imposed on its property exceeded the value of the benefit received.” Id. at 601-02. The fifth district affirmed the trial court’s ruling “that the apportionment of the special assessment was not arbitrary.” Id. at 602.
Confronted with a different approach to apportionment, this court approved the use of historical usage in constructing a fair and reasonable apportionment methodology. In SMM Properties, Inc., North Lauderdale apportioned its special assess *499 ment among burdened properties “based upon actual historical usage of fire rescue services by various categories of property within the City.” 760 So.2d at 1000. This court summarily held that “the methodology used was neither unreasonable nor arbitrary.” Id. at 1004.
In this case, the City’s apportionment methodology combined the use of property categories, an approach approved in City of Winter Springs and Workman Enterprises, Inc., with historical usage, a methodology approved in SMM Properties, Inc. The City started by assigning each property in the city to a different category: single-family residential; multifamily residential; commercial; industrial/warehouse; institutional; and nursing home. Then, the City computed the historical usage of those categories. For the non-residential property categories, the City further divided properties into ranges by square footage.
The City’s methodology was a considered way of apportioning the assessment to ensure that the burden falling on each property would not exceed the benefit received. This was demonstrated by the creation a separate nursing home category, so as to not disproportionately burden other institutional properties. Appellants failed to present the kind of evidence— “strong, direct, clear and positive proof’— required to establish that the apportionment methodology was arbitrary.

Actual Expenditures

Finally, appellants argue that the special assessment is invalid because the City used money it raised through the assessment to fund EMS services. They point to the use of funds to purchase of a fire engine, hire 24 additional cross-trained firefighters, acquire land for a new fire station, and renovate existing fire rescue facilities. As authority for their argument, appellants rely primarily on the Supreme Court’s negative response to this court’s second certified question in SMM Properties, Inc.[3] Appellants contend that the Court’s negative response created a bright-line rule prohibiting such expenditures. We disagree.
The Supreme Court’s answer to the second certified question must be considered in the context of the case, which applied its holding in Lake County to the funding of an integrated fire/EMS department. The better interpretation of the answer to the certified question is that a local government must exclude the cost of EMS from a special assessment to fund an integrated fire rescue program. Neither this court’s decision in SMM Properties nor the Supreme Court’s opinion in City of North Lauderdale struck down North Lauderdale’s special assessment on the ground that the fire department’s equipment and personnel were also used for EMS services. The crux of both holdings was that local governments were required to exclude EMS funding from a special assessment for fire protection services.
' In a time when local governments are confronted with the need for fiscal austerity, integrated fire/EMS departments make financial sense because they reduce costs. We do not believe that City of North Lauderdale should be read in a way that would force local governments to physically separate EMS and fire protection functions in order to preserve their ability to fund the latter with special assessments. The case law requires an accounting sepa *500 ration — such as the intra-account segregation the City used here — and nothing more.
To recapitulate, the methodology the City used to determine special benefit was not arbitrary; appellants produced scant evidence to the contrary, thereby failing to carry their burden. Additionally, the City’s methodology fairly and reasonably apportioned the assessment’s burden, so that it, too, was not arbitrary. Finally, we reject appellants’ interpretation of the Supreme Court’s decision in City of North Lauderdale, and the onerous restrictions such an interpretation would place on local governments.

Affirmed.

STEVENSON and CIKLIN, JJ., concur.

. Bingham testified that water evacuation "is generally a term that's used when sprinkler heads activate within a building. And if it’s a multi-family building, has residential sprinklers, then we get the call to remove the water from those buildings, particularly in high-rises when the water is dripping down into lower apartments.”

. The opponents of the special assessment in SMM Properties had "conceded that the fire services portion of the assessment conferred a special benefit upon their properties.” 760 So.2d at 1000.

. "Can a fire rescue program funded by a special assessment use its equipment and personnel to provide emergency medical services for accidents and illnesses under Lake County v. Water Oak Management Corp., 695 So.2d 667 (Fla.1997)?” SMM Props., Inc., 760 So.2d at 1004 (emphasis removed).