CANADY, C.J.
In this case we consider an appeal from a final circuit court judgment validating revenue bonds proposed to be issued by Okaloosa County to finance a beach restoration project. We have jurisdiction. See art. Y, § 3(b)(2), Fla. Const. For the reasons discussed below, we affirm.
I. BACKGROUND
Okaloosa County (County) developed a plan for beach restoration and renourishment in part of the County. Accordingly, the County commenced the process for obtaining both the permitting and the funding for the project. The County applied separately for the necessary joint coastal permits for the project from the Florida Department of Environmental Protection (DEP). See § 161.041, .055, Fla. Stat. (2007); see generally, ch. 161, Fla. Stat. (2007) (containing Beach and Shore Preservation Act, Coastal Zone Protection Act of 1985, and Oceans and Coastal Resources Act). As to funding, the County determined to use two sources to fund the project: state government grant money where available and revenue bonds. The bonds would in turn be funded with revenue from the first cent of a tourist development tax and from special assessments on properties within a designated Municipal Service Benefit Unit (MSBU), created pursuant to the County’s authority under section 125.01, Florida Statutes (2007).
The County created the MSBU by ordinance in December 2007 (MSBU Ordinance). The MSBU consisted of two specifically designated subassessment areas— one in Okaloosa Island and one in the western portion of the City of Destín. After notice and hearing, the County adopted Resolution 08-125, the “Initial and Final Assessment Resolution” (Assessment Resolution) in August 2008. This resolution adopted and incorporated by reference the October 1, 2007, “Okaloosa County Feasibility Study for Beach Restoration on Oka-loosa Island and the City of Destín Final Report” (Feasibility Study), which contained the apportionment methodology for the special assessments. In the Assessment Resolution, the County imposed special assessments on the properties on the assessment rolls based on its finding that the properties received a special benefit from the restoration project. The County also found the methodology for computing the annual assessments to be fair and reasonable. Subsequently, the County has modified or amended both the MSBU Ordinance and the Assessment Resolution. For example, the boundaries of the MSBU were modified by Ordinance 08-36, pursuant to our decision in Walton County v. Stop the Beach Renourishment, Inc., 998 So.2d 1102, 1121 (Fla.2008), aff'd sub nom. Stop the Beach Renourishment, Inc. v. Fla. Dept. of Envtl. Prot., — U.S. -, 130 S.Ct. 2592, 177 L.Ed.2d 184 (2010), which distinguished between critically eroded and noncritically eroded areas for purposes of beach restoration projects. See § 161.101(1), Fla. Stat. (“Accordingly, *805 the Legislature declares that the state, through the department, shall determine those beaches which are critically eroded and in need of restoration and nourishment .... ”). In turn, the Assessment Resolution was amended to recalculate the assessments on the remaining properties.[1]
In October 2008, the County adopted Resolution 08-201 (Bond Resolution) that authorized the issuance of revenue bonds to fund the beach restoration and renour-ishment project: the Florida Beach Restoration Revenue Bonds, Series 2008, not exceeding $20,000,000. For bond repayment, the County pledged monies from two sources: the first cent of the County’s tourist development tax and the special assessments levied within the MSBU.
The County, on November 18, 2008, filed a bond validation complaint in the circuit court pursuant to chapter 75, Florida Statutes (2008). Appellants — property owners within the MSBU subject to the assessments — intervened, filing an answer and a number of counterclaims to the County’s complaint. The bond validation hearing was held in April and August 2009, and on March 26, 2010, the trial court issued an order validating the bonds. The circuit court determined that the County was authorized to issue the bonds and use the proceeds for the beach renourishment project. Moreover, the court determined that the MSBU was lawfully created, the assessments were lawfully imposed, and the assessment methodology was fair and reasonable. The court further determined that the property owners subject to the assessment receive a special benefit from the project in enhanced storm protection and for some properties protection from destruction, enhanced property values and marketability, and increased use and enjoyment of recreational amenities. Finally, the court ruled that many of the issues raised by appellants, such as the quality of the sand to be used in the restoration and where the erosion control line for the project would be located, were collateral to the bond validation proceedings and thus not appropriate for determination in such proceedings. See § 161.151(3), Fla. Stat. (defining “erosion control line”). Appellants timely filed an appeal in this Court. See § 75.08, Fla. Stat.
II. STANDARD OF REVIEW
Our review of a bond validation proceeding is limited to three issues: (1) whether the public body has authority to issue bonds; (2) whether the purpose of the obligation is legal; and (3) whether the bond issuance complies with the requirements of law. Strand v. Escambia Cnty., 992 So.2d 150, 154 (Fla.2008) (citing City of Gainesville v. State, 863 So.2d 138, 143 (Fla.2003)). The trial court’s order comes to this Court with a presumption of correctness. Thus, “[t]he appellant has the burden of demonstrating that the record and evidence fails to support the County and the trial court’s conclusions.” State v. Osceola Cnty., 752 So.2d 530, 533 (Fla.1999). This Court applies the competent, substantial evidence standard of review to the trial court’s findings of fact and de novo review to the conclusions of law. Strand, 992 So.2d at 153.
III. ANALYSIS
Appellants argue several claims in this appeal: (A) the County failed to comply *806 with the procedural requirements for adopting the Assessment Resolution; (B) the bond validation was premature because the DEP permits for the project had not been issued; (C) the bonds do not serve a paramount public purpose; (D) the special assessment is invalid; and (E) the special assessments fund improvements outside the MSBU.[2] We address each of these in turn.
A. Adoption of the Final Assessment Resolution
Appellants erroneously contend that in adopting the Assessment Resolution (08-125), the County failed to comply with the requirements of its MSBU Ordinance (07-71), and as a result, the circuit court lacked jurisdiction to validate the bonds.
Chapter 75, Florida Statutes, governs bond validation proceedings, and section 75.03 provides the condition precedent for a taxing authority to seek bond validation in the circuit court as follows:
As a condition precedent to filing of a complaint for the validation of bonds or certificates of debt, the county, municipality, state agency, commission or department, or district desiring to issue them shall ... when permitted by law, adopt an ordinance, resolution or other proceeding providing for the issuance of such bonds or certificates in accordance with law.
The County fulfilled this condition when it adopted the Bond Resolution (08-201), authorizing issuance of revenue bonds to finance the beach restoration project. With this condition satisfied, the County was authorized to file a complaint in circuit court for a determination of its “authority to incur bonded debt ... and the legality of all proceedings in connection therewith.” § 75.02, Fla. Stat. Accordingly, the circuit court had jurisdiction to hear the bond validation proceeding.
Appellants’ claim of error, however, concerns the Assessment Resolution, not the Bond Resolution. Appellants’ contention that a procedural irregularity in the County’s adoption of the Assessment Resolution effectively invalidated the special assessments goes to the question of whether the assessments were lawfully imposed. Because the MSBU assessments would in part fund the revenue bonds, the issue was properly before the circuit court. See § 75.01 (“Circuit courts have jurisdiction to determine the validation of bonds and certificates of indebtedness and all matters connected therewith.”). Thus, regardless of how the circuit court ruled on the issue, the court would not be deprived of jurisdiction in the bond validation case.
As to the claim of invalidity, appellants specifically argue that under the provisions of the MSBU Ordinance, the County was not authorized to adopt the Assessment Resolution, which constituted both the initial and the final assessment resolution. The circuit court rejected this contention, determining that “[a]s all the requirements of the initial assessment resolution had been complied with prior to the public hearing held on August 7, 2008, *807 a separate hearing was not necessary for consideration of the initial resolution and both the initial and final resolutions could be adopted jointly.” Okaloosa Cnty. v. State, No.2008 CA 006280 S (Fla. 1st Cir. Ct. Final Judgment filed Mar. 31, 2010). We agree. There is no dispute that notice was provided, that the proposed assessment roll and the feasibility study were made available to the public, and that a hearing was subsequently held. These were the requirements of the MSBU Ordinance for adopting the Assessment Resolution. The MSBU Ordinance did not require a separate hearing or other proceeding to adopt first an initial and then a final assessment resolution. Thus, after the noticed hearing, the County was authorized to adopt the final assessment resolution. The County’s interpretation of its own ordinance is entitled to deference. See Verizon Fla., Inc. v. Jacobs, 810 So.2d 906, 908 (Fla.2002) (stating that courts ordinarily defer to a governmental body’s interpretation of a statute or rule unless the agency’s expertise is not required or its interpretation conflicts with the plain and ordinary meaning of the provision). Here, the language of the ordinance supports the County’s interpretation.[3] Accordingly, appellants failed to demonstrate that they were deprived of any due process right or that the circuit court lacked jurisdiction of the bond validation action.
B. Bond Validation and Permit Issuance
Appellants next argue that the County failed to demonstrate that DEP will issue the permits for the beach ren-ourishment project and thus the circuit court erred in validating the bonds. There is no statutory requirement that a bond-issuing authority make such a showing in a bond validation proceeding. Appellants instead rely on our decision in Hillsboro Island House Condominium Apartments, Inc. v. Town of Hillsboro Beach, 263 So.2d 209 (Fla.1972), for this contention.
In Hillsboro Island, a group of citizens challenged the circuit court’s validation of bonds to fund a beach erosion project, arguing in part that “the bond issue is premature because the project cannot be undertaken without approval of outside authorities having jurisdiction over the Atlantic shore, including Broward County, the State of Florida, and agencies of the United States government.” 263 So.2d at 211. Borrowing from our decision in Seadade Industries, Inc. v. Florida Power & Light Co., 245 So.2d 209 (Fla.1971), a case in which a utility company sought to condemn land adjacent to its facilities to construct a discharge canal, we established the following test:
We held in Seadade that a reasonable demonstration that regulations would be met, and a similar demonstration that work in advance of approval would not lead to irreparable harm to the environment should approval be denied, would be sufficient, if deemed so by the courts, unless an adverse party presented strong and convincing proof to the contrary. The Seadade rationale would seem appropriate here. We hold that the bond issue could be validated where the requisite reasonable showings have been made, where these showings have been judged sufficient by the court involved, and where the adverse party has not presented strong and convincing proof to the contrary.
Hillsboro Island, 263 So.2d at 211.
The County readily met the requirements to demonstrate that regulations *808 would be met. The County’s coastal engineer testified regarding the design of the project and progress of the County through DEP’s coastal permitting process, noting that the agency review process was nearly completed and permit issuance was anticipated. As for the second prong — the risk of irreparable harm from work in advance of permitting — no demonstration was necessary because no work could commence in advance of permit issuance. See § 161.041, Fla. Stat. (“[A] coastal construction permit must be obtained from the department prior to the commencement of any such work.”). Moreover, appellants did not present strong and convincing proof that the County would not meet the requirements for a permit. Like the litigants in Hillsboro Island, “[ajppellants have presented little adverse evidence; their main thrust is simply that the permissions have not yet been secured.” 263 So.2d at 212.
At the bond validation hearing, appellants contested issues related to the actual terms of the permits. For example, appellants challenged the source and quality of the sand the County had proposed to be used in the project and argued over where the erosion control line would ultimately be located. The circuit court correctly determined that these issues were collateral to the proceeding before it.
As we have stated, “[tjhe function of a validation proceeding is merely to settle the basic validity of the securities and the power of the issuing agency to act in the premises. Its objective is to put in repose any question of law or fact affecting the validity of the bonds.” State v. Manatee Cnty. Port Auth., 171 So.2d 169, 171 (Fla.1965). “It was never intended that proceedings instituted under [chapter 75] to validate governmental securities would be used for the purpose of deciding collateral issues or other issues not going directly to the power to issue the securities and the validity of the proceedings with relation thereto.” State v. City of Miami, 103 So.2d 185, 188 (Fla.1988). These permitting issues raised by appellants exceed the court’s scope of review in a bond validation proceeding. Our decision in Hillsboro Island was never intended to require adjudication in the bond validation proceedings of the details of the construction of the project itself and the terms of the permitting process. With regard to beach ren-ourishment projects, the DEP is responsible for reviewing permit applications and issuing permits that ensure compliance with the requirements of the law. See §§ 161.041, .055. The proper forum for such issues is available through administrative proceedings regarding the permits. See §§ 120.569-.57. Fla. Stat. (2009).[4]
Finally, we have said that “special assessments are ‘charge[sj assessed against [the] property of some particular locality because that property derives some special benefit [from] the expenditure of [the] money.’ ” City of Gainesville v. State, 863 So.2d 138, 144 (Fla.2003) (quoting Workman Enters., Inc. v. Hernando Cnty., 790 So.2d 598, 599 (Fla. 5th DCA 2001)). In the event that the County does not obtain the necessary environmental permits for the project, the bonds will not issue, the beach will not be restored and renour-ished, and no special benefits will accrue to the MSBU property owners. As a result, the County would refund the special assessments previously paid by the MSBU property owners with interest. This is *809 exactly what the County has done when properties were previously removed from the MSBU.
C. Public Purpose
The County is authorized by law to issue bonds to fund a project to restore and renourish the state’s beaches. See art. VII, § 12, Fla. Const.; § 125.01, Fla. Stat. (2007). As stated previously, the bonds in this case are funded by revenue from the tourist development tax and special assessments on the properties within the MSBU. See §§ 125.01, .0104, Fla. Stat. In turn, the imposition of a special assessment to fund a bond issuance requires (1) that the property subject to the assessment derive a “special benefit” and (2) that the assessment be properly apportioned among the specially benefitting properties. City of Winter Springs v. State, 776 So.2d 255, 258 (Fla.2001). Appellants’ argument in this issue rests on the County’s imposition of a special assessment on the property within the MSBU. Relying on our decision in Orange County Industrial Development Authority v. State, 427 So.2d 174 (Fla.1983), appellants claim that the finding that their properties would receive a “special benefit” from the beach renourishment project undermines the public purpose of the project itself and thus the bonds cannot be validated.
In Orange County, we reviewed the county’s appeal from a circuit court judgment determining that the bonds violated article VII, section 10 of our state constitution and thus denied validation. 427 So.2d at 176. This provision of our constitution states in part that “[n]either the state nor any county, school district, municipality, special district, or agency of any of them, shall ... give, lend or use its taxing power or credit to aid any corporation, association, partnership or person.” Art. VII, § 10, Fla. Const.[5] We have stated that the “purpose of [this provision] is ‘to protect public funds and resources from being exploited in assisting or promoting private ventures when the public would be at most only incidentally benefited.’ ” State v. Miami Beach Redevelopment Agency, 392 So.2d 875, 885 (Fla.1990) (emphasis added) (quoting Bannon v. Port of Palm Beach Dist., 246 So.2d 737, 741 (Fla.1971)).
In addressing a claim of bond invalidity under article VII, section 10, we first determine whether the project proposed to be funded by the bonds is expressly authorized under that provision. See art. VII, § 10(a)-(d), Fla. Const. If the project does not expressly qualify, we apply a two-step test to ascertain whether the bonds are nevertheless authorized by the constitutional provision: (1) whether the taxing authority has pledged its credit or used it taxing power; and (2) whether the project to be funded serves a paramount public purpose. See Orange Cnty., 427 So.2d at 178. Under this test,
[i]f the County has not exercised its taxing power or pledged its credit, the obligation must merely serve a public purpose.... [I]f the County has used either its taxing power or pledge of credit to support the issuance of the bonds, the purpose of the obligation *810 must serve a paramount public purpose and any benefits to a private party must be incidental.
State v. Osceola Cnty., 752 So.2d 530, 536 (Fla.1999) (emphasis added); see Miccosulcee Tribe of Indians of Fla. v. S. Fla. Water Mgmt. Dist., 48 So.3d 811, 822 (Fla.2010) (“If the District has not exercised its taxing power or pledged its credit to support the bond obligation, the obligation is valid if it serves a public purpose.”); Linscott v. Orange Cnty. Indus. Dev. Auth., 443 So.2d 97, 101 (Fla.1983).
Thus, under the paramount public purpose requirement, the benefit to a private party must be incidental; that is, “the bonds will be validated [when] the private benefits ‘are not so substantial as to tarnish the public character’ of the project.” Orange Cnty., 427 So.2d at 179 (quoting State v. City of Miami, 379 So.2d 651, 653 (1980)); see State v. Housing Fin. Auth. of Polk Cnty., 376 So.2d 1158, 1160 (Fla.1979). Where only a public purpose is required, however, “it is immaterial that the primary beneficiary of a project be a private party, if the public interest, even though indirect, is present and sufficiently strong.” Housing Finance Auth., 376 So.2d at 1160. But, if the private benefits are the paramount purpose for a project, the bonds cannot be validated under the constitution even if there is some public benefit. Orange Cnty., 427 So.2d at 179.
We applied the two-pronged test in Orange County and concluded that there was minimal public benefit from the county’s proposed revenue bond financing of the purchase of land and construction of a commercial television station for an existing business. Accordingly, we found that a “paramount private purpose” would be served by the project and held that the bonds could not be validated, explaining that “[a] broad, general public purpose ... will not constitutionally sustain a project that in terms of direct, actual use, is purely a private enterprise.” 427 So.2d at 179 (emphasis added).
In this case, appellants do not cite article VII, section 10, or argue that the County has failed to meet the first prong of the test. That is, they do not specifically argue that the County’s pledge of revenues from the tourist development tax constitutes a pledge of credit or taxing power under article VII, section 10. Their claim that bonds must serve a “paramount public purpose” rather than a public purpose thus is conclusory. However, even if the paramount public purpose test applies, the project in this case readily meets that standard.
We have previously stated that “[w]hat constitutes a public purpose is, in the first instance, a question for the legislature to determine, and its opinion should be given great weight.” Housing Fin. Auth., 376 So.2d at 1160. The Florida Legislature has expressed the state’s policy on beach restoration and renourishment in the Beach and Shore Preservation Act, §§ 161.011-161.45, Fla. Stat. (2007), as follows:
Because beach erosion is a serious menace to the economy and general welfare of the people of this state and has advanced to emergency proportions, it is hereby declared to be a necessary governmental responsibility to properly manage and protect Florida beaches fronting on the Atlantic Ocean, Gulf of Mexico, and Straits of Florida from erosion and that the Legislature make provision for beach restoration and nourishment projects, including inlet management projects that cost-effectively provide beach-quality material for adjacent critically eroded beaches. The Legislature declares that such beach restoration and nourishment projects, as *811 approved pursuant to s. 161.161, are in the public interest....
§ 161.088, Fla. Stat. (emphasis added); see art. II, § 7(a), Fla. Const. (“It shall be the policy of the state to conserve and protect its natural resources and scenic beauty. Adequate provision shall be made by law for the abatement of air and water pollution ... and for the conservation and protection of natural resources.”); see also art. X, § 11 (“The title to lands under navigable waters, within the boundaries of the state, which have not been alienated, including beaches below mean high water lines, is held by the state, by virtue of its sovereignty, in trust for all the people.”). Thus, the proposed beach renourishment project in this case serves the “necessary governmental responsibility” of addressing a “serious menace to the economy and general welfare of the people of this state.” § 161.088, Fla. Stat. Moreover, in Walton County, we acknowledged that the Beach and Shore Preservation Act effectuates the State’s constitutional duty “to protect Florida’s beaches, part of which it holds in trust for public use.” 998 So.2d at 1114— 15.
Unlike the situation in Orange County, the special benefits received by those in the MSBU do not “tarnish” the public nature of the project. In Orange County, we found that the benefits to the private television company would overwhelm the minimal benefit to the public such that the proposed project would serve a “paramount private purpose.” 427 So.2d at 179. In this case, the properties subject to the special assessment will receive special benefits as a result of the project. The provision of those special benefits to private parties is not the purpose of the beach restoration project. See id. (“If, however, the benefits to a private party are themselves the paramount purpose of a project, then the bonds will not be validated even if the public gains something therefrom.”). That is, the special benefits — for which the property owners must pay — do not convert beach restoration into “a project that in terms of direct, actual use, is purely a private enterprise.” Id. Beach and shore preservation projects confront a critical threat to the welfare of the people of this state. Those special benefits that flow incidentally to certain properties because of the nature of the project do not diminish its predominantly public character. Nor does the predominantly public purpose of the project negate the special benefits received by the properties subject to special assessments.
D. Validity of the Special Assessment
In determining whether a bond issue meets the requirements of law, we have said that
a special assessment funding a bond issuance must satisfy the following two-prong test: (1) the property burdened by the assessment must derive a special benefit from the service provided by the assessment; and (2) the assessment for the services must be properly apportioned among the properties receiving the benefit.
City of Winter Springs v. State, 776 So.2d 255, 257 (Fla.2001). Appellants claim in this issue that the special assessment in this case does not meet either prong of this test.
We have held that the findings of special benefit and proper apportionment of costs among the properties assessed are legislative in nature and presumed correct. City of Boca Raton v. State, 595 So.2d 25, 30 (Fla.1992) (“The apportionment of benefits is a legislative function, and if reasonable persons may differ as to whether the land assessed was benefitted by the local improvement, the findings of the city officials must be sustained.”). “[T]he standard [for determin *812 ing whether to sustain the findings] is the same for both prongs; that is, the legislative determination as to the existence of special benefits and as to the apportionment of the costs of those benefits should be upheld unless the determination is arbitrary.” Sarasota Cnty. v. Sarasota Church of Christ, 667 So.2d 180, 184 (Fla.1995). Accordingly, the findings will be sustained if they are supported by competent, substantial evidence. See State v. Sarasota Cnty., 693 So.2d 546, 548 (Fla.1997) (holding findings of special benefit were not arbitrary where supported by competent, substantial evidence). The presumption of correctness “can be overcome only by strong, direct, clear and positive proof.” Meyer v. City of Oakland Park, 219 So.2d 417, 420 (Fla.1969). The property owner has the burden to rebut this presumption. Workman Enters., Inc., 790 So.2d at 600 (citing City of Gainesville v. Seaboard Coastline R.R. Co., 411 So.2d 1339, 1340 (Fla. 1st DCA 1982)). Evidence of the “mere disagreement of experts” is insufficient basis for disturbing the County’s findings. City of Winter Springs, 776 So.2d at 261 (“[A] mere disagreement of experts as to the choice of methodology is legally inconsequential.”). Thus, the property owner must demonstrate that the findings are clearly erroneous. Strand v. Escambia Cnty., 992 So.2d at 154.
1. Special Benefits
As stated above, the first prong of the test is whether the improvement or service, in this case beach restoration, provides a special benefit to the assessed property.
In evaluating whether a special benefit is conferred to property by the services for which the assessment is imposed, the test is not whether the services confer a “unique” benefit or are different in type or degree from the benefit provided to the community as a whole; rather, the test is whether there is a “logical relationship” between the services provided and the benefit to real property.
Lake County v. Water Oak Mgmt. Corp., 695 So.2d 667, 669 (Fla.1997) (footnote omitted). In this case, the County made the following legislative findings of special benefits from the beach restoration and renourishment project conferred on the properties subject to the assessment:
(D) The Project provides a special benefit to all property located within the MSBU including improving and securing road access, protecting the natural environment associated with the beach, providing enhanced storm protection, protecting and enhancing the market value and marketability of properties within the MSBU, and enhancing the use and enjoyment of such property through the provision of the aesthetic and recreational beach amenities. The Project will provide property owners within the MSBU with a greatly expanded beach area for their use and enjoyment. The presence of the beach also serves as a primary motivator for people to live in the MSBU or to visit properties in the MSBU.
Okaloosa Cnty., Fla., Amended Beach Restoration Mun. Serv. Benefit Unit Final Assessment Resolution (Oct. 7, 2008) (Amended Beach Restoration Resolution) at 8-9. We presume these legislative findings to be correct, and as we explain below, we find that they are supported by competent, substantial evidence.
The County presented evidence that the project would provide storm damage protection for up to a fifty-year storm event throughout the project area. Without the renourishment project, such a storm event would eradicate the existing dune and undermine some structures, *813 while destroying others. The addition of the sand will create wider dry beaches that provide this necessary protection to property owners. Moreover, as a result of the project, both the market value of the properties and their marketability would increase. Finally, the larger beaches will provide increased recreational opportunities that enhance use and enjoyment. We have previously upheld similar findings as establishing special benefits. See, e.g., City of Winter Springs, 776 So.2d at 259 (affirming special benefit finding that project within subdivision boundaries “would improve exterior subdivision boundaries, interior subdivision areas, subdivision identity and subdivision aesthetics, and would enhance the safety, value, and the use and enjoyment of all properties within the District”); Meyer, 219 So.2d at 420 (affirming findings of “increase in market value” and “actual increase in money value and also potential or actual or added use and enjoyment of the property” as special benefits); City of Treasure Island v. Strong, 215 So.2d 473, 478 (Fla.1968) (determining that state legislature’s language in city’s charter constituted finding that construction of erosion control groin system “presumably would result in benefits inuring specially to the properties protected thereby”). Appellants’ contentions that some of the properties do not receive any additional storm damage protection are contradicted by evidence in the record, and they have not demonstrated that the County’s findings are clearly erroneous.
Finally, appellants argue that their expert’s cost-benefit analysis demonstrates that the restoration project is a detriment and does not provide a special benefit. The County’s expert testified that a conservative cost-benefit analysis — based only on added storm damage protection — demonstrated that the benefits of the project significantly outweighed the costs. He estimated the costs would range from $11 million to $14 million, while the benefits would range from $21 million to $44 million. In contrast, appellants’ expert economist testified that because no permit had issued, the project did not exist and thus there were no special benefits to consider. Moreover, using the County’s figures, he opined that the costs of the project outweighed the benefits. In this instance of dueling experts, we hold that competent, substantial evidence supports the trial court’s determination that the project provides a special benefit. See City of Winter Springs, 776 So.2d at 261 (stating that such disagreement between experts is “legally inconsequential”).
2. Assessment Apportionment
The second question we must consider is whether the special assessment is fairly apportioned among the specially benefitting properties. City of Boca Raton, 595 So.2d at 29 (“Second, the assessment must be fairly and reasonably apportioned among the properties that receive the special benefit.”). As stated above, the findings regarding apportionment are legislative in nature. Accordingly, even if other methods of apportionment also appear to be valid, the method used must be upheld unless it is determined to be arbitrary. City of Winter Springs, 776 So.2d at 259 (“And though a court may recognize valid alternative methods of apportionment, so long as the legislative determination by the City is not arbitrary, a court should not substitute its judgment for that of the local legislative body.”).
By ordinance, the County adopted a methodology for computing the assessments based on two of the special benefit categories: storm damage reduction and recreation. Each subassessment area was treated separately so that only the assess *814 ments from the properties within an area were used to pay for the improvements that benefited that area. Based on the availability of state funding and the tourist development tax, the assessment for the Okaloosa Island area would constitute 24 percent of the project costs, and for the Destín project 36 percent. The methodology allocates 60 percent of the unfunded local cost to storm damage reduction, and 40 percent to recreation. Moreover, the storm damage reduction benefit was assessed only against beachfront properties and was based on factors such as lot size, units per lot, and linear beach frontage, with an additional classification factor applied to nonhabitable properties, such as restaurants. The recreation benefit was allocated to all properties on a pro-rata basis. With regard to the assessment apportionment methodology, the County in this case made the following findings:
(E) Since the benefits received by properties from the Project vary depending on the type of benefit and proximity to the Project, with all properties receiving a recreational benefit and with beachfront properties receiving a storm protection benefit, it is fair and reasonable for the County to establish separate Areas and apportion a share of the Capital Cost among the Areas.
(F) The Board finds that the treatment of hotel and commercial facilities within the boundaries of the MSBU is fair and reasonable based upon the respective benefits derived from the Project. Any differences between the treatment of Property types is based upon reasonable and appropriate differences existing between these properties.
(G) The Board hereby finds and determines that the Assessments to be imposed in accordance with this Resolution provide an equitable method of funding the construction of the Project by fairly and reasonably allocating the cost to specially benefitted property based upon the relative degree of benefit attributable to each parcel.
Amended Beach Restoration Resolution at 9.
Appellants take issue with the formula and the factors on which the methodology is based, but they have not established that the County’s findings are arbitrary. Their claims are premised on contentions that a host of other factors specific to each property should have been considered in this analysis. The methodology for apportioning the costs of the project within each subassessment area with regard to the benefits afforded by the project, however, are based on reasonable, objective factors. Accordingly, we conclude that competent, substantial evidence supports the trial court’s determination that the County’s methodology is fair and reasonable.
E. Improvements in the MSBU
Finally, appellants allege that the ren-ourishment project will add sand seaward of the mean high water line, creating new beach to which the State will hold title. As a result, they argue that this new area of land will not actually be “within” the MSBU and the properties within the MSBU will not receive any benefit from the beach restoration project. We find no merit to this contention.
Section 125.01(l)(q), Florida Statutes, does not require that the erosion control project actually be located “within” the MSBU. The statute in pertinent part provides the county with the power to
[ejstablish ... municipal service taxing or benefit units for any part or all of the unincorporated area of the county, within which may be provided fire protection; law enforcement; beach erosion control; ... and other essential facilities and municipal services from funds derived from service charges, special as *815 sessments, or taxes within such unit only.
(Emphasis added.) Here, competent, substantial evidence established that the beach renourishment project will provide a special benefit of storm damage reduction and enhanced recreation within the MSBU, and the specially benefitting properties have been assessed. As we noted in Hillsboro Island, requiring that sand only be placed within the boundary of the political subdivision “would be to ignore the mechanics of erosion.” 26B So.2d at 212. Although that case involved a general obligation bond — not a special assessment — in a town threatened with complete destruction, the fact remains that regardless of how much sand is added outside the boundaries of the MSBU, the special benefits are nevertheless provided -within it.
IV. CONCLUSION
For the foregoing reasons, we affirm the circuit court’s final judgment of validation of the bonds in this case.
It is so ordered.
PARIENTE, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.
LEWIS, J., concurs in result.

. Resolution 08-192 amended the Assessment Resolution, deleting the assessment for properties excluded from the MSBU and recalculating the assessments. Resolution 09-104 later corrected other erroneous assessments, and Resolution 09-105, the Amended and Restated Initial Assessment Resolution, provided for further adjustments to the assessment rolls.

. We decline to address appellants' hypothetical question: whether MSBU funds can constitutionally be used to compensate an owner if the restoration project results in a taking. See Santa Rosa Cnty. v. Admin. Comm'n, 661 So.2d 1190, 1193 (Fla.1995) (“Florida courts will not render, in the form of a declaratory judgment, what amounts to an advisory opinion at the instance of parties who show merely the possibility of legal injury on the basis of a hypothetical state of facts which have not arisen and are only contingent, uncertain, [and] rest in the future.” (quoting LaBella v. Food Fair, Inc., 406 So.2d 1216, 1217 (Fla. 3d DCA 1981) (internal quotation marks omitted))); Interlachen Latees Estates, Inc. v. Brooks, 341 So.2d 993, 995 (Fla.1976).

. That the County in 2009 used a different procedure in adopting an amended and restated assessment resolution is of no moment here.

. In fact, appellants admit in their brief that they have challenged DEP's notices of intent to issue both the Destín and Okaloosa Island permits in administrative proceedings pursuant to chapter 120, Florida Statutes. DEP filed the notices after the final hearing in this case.

. See Jackson-Shaw Co. v. Jacksonville Aviation Auth., 8 So.3d 1076, 1097 (Fla.2008) ("As we have defined credit and the lending of credit, the constitutional prohibition contemplates not just the use of public funds but the imposition of a new financial liability and a direct or indirect obligation to pay a debt of a third party.”); Nohrr v. Brevard Cnty. Educ. Facilities Auth., 247 So.2d 304, 309 (Fla.1971) ("'[C]redit’ as used in Fla. Const., art. VII, § 10 (1968), implies the imposition of some new financial liability upon the State or a political subdivision which in effect results in the creation of a State or political subdivision debt for the benefit of private enterprises.”).