# Third District Court of Appeal

## State of Florida

Opinion filed January 18, 2017.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D14-439
Lower Tribunal Nos. 10-29182 & 11-32522

_____

## Indian Creek Country Club, Inc., etc.,
Appellant/Cross-Appellee,

vs.

## Indian Creek Village, etc.,
Appellee/Cross-Appellant.

An appeal from the Circuit Court for Miami-Dade County, Marc Schumacher, Judge.

Akerman LLP and Carmen I. Tugender (Ft. Lauderdale); Akerman LLP and Gerald B. Cope, Jr., Brian P. Miller, and Michael B. Chavies, for appellant/cross-appellee.

Weiss Serota Helfman Cole & Bierman, P.L. and Edward G. Guedes, Joseph H. Serota, Stephen J. Helfman, and John J. Quick, for appellee/cross-appellant.

Before SUAREZ, C.J., and LAGOA and LOGUE, JJ.

SUAREZ, C.J.

Indian Creek Country Club appeals from two final orders: 1) a Final Judgment in the Club's favor finding certain special assessments to be invalid, and

2) Partial Final Summary Judgment in favor of Indian Creek Village ["the Village"] finding a 1996 Agreement between the two entities void. Indian Creek Village cross-appeals from the special assessments Final Judgment. For the reasons detailed below, we affirm the trial court's Final Judgment in favor of the Club but we reverse the trial court's Partial Final Summary Judgment wherein the trial court declared the 1996 Agreement to be void.

FACTS

The Village is a coastal Florida municipality within whose boundaries exists Indian Creek Island, on which the gated, private Indian Creek Country Club ["Club"] is located. The Club operates a golf course, clubhouse, docks and tennis courts for its members. The Island also has 41 single family homes, and is connected to the mainland Village by a public road and bridge with guardhouse, although the Island is entirely private. The Club is accessed by private road; most of the Club's 300 members live elsewhere. The Village has its own land and marine police force to provide 24/7 law enforcement and traffic services to Village residents and also provides general law enforcement and police assistance to the Club and Village residents on the Island. The Club pays approximately $34,000 in ad valorem taxes to the Village to cover the annual cost of these services.

In 2008, the Village hired a contractor, Government Services Group, Inc., ["GSG"] to evaluate the Village's budget and to develop a special assessments to support the police department, as well as to recommend how to apportion such an

assessment. GSG determined that 97% of the police department's time and budget were spent on security matters such as manning the guard house that controls access to the Island and providing for ground and water patrol of the Island. GSG recommended a special assessment to cover that 97%. GSG recommended that the special assessment be allocated based on what it termed "an equivalent residential unit" (ERU). Each residential buildable lot was to be assigned one ERU. Therefore, each of the residential buildable lots was assessed $25,510 (the amount of one ERU). The GSG recommended assigning 33.02 ERU's to the Club's Golf Course property arriving at a proposed special assessment of $843,340.00 for the Club. In 2010, based on GSG's recommendations, the Village passed an $843,340.00 special assessment against the Club for security services intended to cover 97% of the Village's police budget. The Club brought a declaratory judgment action against the Village to challenge the legality of the assessment. While that suit was pending, the Village obtained passage of legislation in the 2011 session, by floor amendment, that amended Florida's special assessment statute to say "a municipality that has a population fewer than 100 persons . . . may also levy and collect special assessments to fund special security and crime prevention services and facilities, including guard and gatehouse facilities." § 170.201(1) Fla. Stat. (2011). This amendment was added to a bill entitled "An Act relating to local government accountability." The Village imposed the special assessment on the Club in 2011, increasing the Club's taxes to $1,724,763.00.[1] The Club brought

3

another suit to challenge the 2011 assessment and the two cases were consolidated. The Club argued that this amendment violated the single subject act, as the tacked-on amendment had no logical relationship to the bill.

Additionally, as part of the proceedings below, the Village asked the trial court to set aside a 1996 Agreement between the Village and the Club, which Agreement canceled the Village's lease of the road and bridge from the Club, gave the bridge to the Village in as-is condition, and gave the Village the right to patrol the Club's private road for the sole purpose of "enforcing State and County traffic laws." The 1996 Agreement also provided that if there were any special tax assessments levied against all property in the Village, the Club would be assessed in the same proportion as its assessment for ad valorem taxes. The Village moved for partial summary judgment on its request to invalidate the 1996 Agreement, arguing that several of the Village Councilmembers voting on the Agreement in 1996 were, at that time, Club members, which, the Village argued, created a conflict of interest. The trial court granted partial summary judgment in favor of the Village on this issue, concluding that the Councilmembers who were also Club members should not have voted as they stood to gain special private benefit from the Agreement.

After a bench trial, the court ruled that, 1) the 2010 special assessment against the Club was invalid for failing to meet either prong of the two-part test for

---

[1] This includes the sum of the 2010 and 2011 assessments.

evaluating the validity of such special assessments as set forth in City of Boca Raton v. State, 595 So. 2d 25 (Fla. 1992), 2) the 2011 special assessment was invalid for failing to meet the second prong of the two-part test, but, 3) also found that the 2011 statutory amendment was validly enacted and satisfied the first part of the two-part test by conferring a special benefit on the property so assessed, rejecting the Club's single-subject violation argument.

The Club appeals from that part of the final declaratory judgment finding special benefit to the Club based on the 2011 statutory amendment, despite the favorable ruling finding the 2011 assessment invalid. The Club also appeals from the order granting the Village's Amended Motion for Partial Summary Judgment invalidating the 1996 Agreement.

THE 2010-2011 SPECIAL ASSESSMENTS

"[A] valid special assessment must meet two requirements: (1) the property assessed must derive a special benefit from the service provided; and (2) the assessment must be fairly and reasonably apportioned according to the benefits received." Sarasota Cty. v. Sarasota Church of Christ, 667 So. 2d 180, 183 (Fla. 1995) (citing City of Boca Raton v. State, 595 So. 2d 25, 30 (Fla. 1992)). "These two prongs both constitute questions of fact for a legislative body rather than the judiciary." Id. at 183. "[T]he standard [of review] is the same for both prongs; that is, the legislative determination as to the existence of special benefits and as to the apportionment of the costs of those benefits should be upheld unless the

5

determination is arbitrary." Id. at 184; City of Winter Springs v. State, 776 So. 2d 255, 258 (Fla. 2001). "Even an unpopular decision, when made correctly, must be upheld." Id. at 261. See also Morris v. City of Cape Coral, 163 So. 3d 1174, 1176-77 (Fla. 2015).

"The apportionment of benefits is a legislative function, and if reasonable people may differ as to whether the land assessed was benefitted by the local improvement, the finding of the city officials must be sustained." Roche v. City of Hollywood, 55 So. 2d 909 (Fla. 1952); City of Boca Raton, 595 So. 2d at 30. But if there is no competent substantial evidence in the record to support a finding of benefit, then the presumption of correctness does not attach to the municipality's findings of special benefit – and then the court must review the trial court's decision based on ordinary findings of fact. See City of N. Lauderdale v. SMM Properties, 825 So. 2d 343, 348 (Fla. 2002). That test was set forth in Lake County v. Water Oak Management Corp., 695 So. 2d 667, 669 (Fla. 1997). In Lake County, the Court stated that "In evaluating whether a special benefit is conferred to property by the services for which the assessment is imposed, the test is not whether the services confer a 'unique' benefit or are different in type or degree from the benefit provided to the community as a whole; rather the test is whether there is a 'logical relationship' between the services provided and the *benefit to real property*." Id. [emphasis supplied].

In reviewing the record, this Court must ascertain whether it contains competent substantial evidence that the special assessments against the Club property for security and law enforcement services would confer a special benefit to the Club's real property (i.e., golf course, clubhouse, tennis courts) in reduction of insurance costs, increased property values, etc., that the benefits would exceed the amount of the assessments, and that the benefits would be in proportion to the assessments. See City of Boca at 30; City of N. Lauderdale v. SMM Properties, 825 So. 2d 343, 348 (finding that no competent substantial evidence supported the municipality's findings that the special assessment provided special benefit to the properties, although the municipality did make general findings that there was a special benefit to the assessed property). Just saying it is so does not make it so: "a legislative body cannot by its fiat make a special benefit to sustain a special assessment where there is no special benefit." Id. at 348 (citations omitted).

The trial court found record evidence that:

- At no time does the Club use services of on-duty police officers to provide security for Club events;

- The Village's full-time police officers patrol the road to the island where the Club exists;

- The Village's marine patrol supports the sovereign function of the Village to protect its citizens and property by deterring crime; the marine patrol keeps the public from coming ashore on the private island;

- The Village's public service aides limit land access to the island;

7

- The Village relied on assessment recommendations of GSG that were clearly erroneous, arbitrary, or without basis in reason, and were clearly unsupported by competent substantial evidence;

- No evidence in the record that "special" benefits were conferred on the Club's real property from the provision of general law enforcement that would justify the additional assessments; GSG did not perform any studies to determine whether the real property in the Village was specially benefitted from security service, i.e., increased property values, lowered insurance premiums, etc., and there was no available data that could quantify how, if at all, the services that are the subject of the special assessment impact the value of the Club.

The trial court concluded that it was not its job to approve or disapprove of the methodology that GSG used to formulate a recommended assessment value. The trial court did, however, determine that there was no record evidence (i.e., data) to support the 2010 and 2011 special assessments as against the Club, and thus invalidated the assessments as arbitrary.

We agree with the trial court that both the 2010 and 2011 assessments were unsupported by competent substantial evidence and, therefore, are invalid. GSG considered several methodologies for evaluating how the special assessments could be calculated (traffic frequency over the bridge; land area/lot size; frontage measurements; "equivalent residential units" or ERUs). GSG ultimately used the ERU measure, which assigned 33.02 ERUs to the Club's golf course property – by assuming that land area was equal to 40 buildable residential lots, and thus a $25,510 assessment per buildable lot resulted in a special assessment for the Club's golf course of $842,340.00. GSG then used this numeric to recommend an

8

assessment value to the Village, which then imposed that assessment on the Club. The problem is that golf course and tennis court land is not residential. GSG did not consider how the Club actually used its real property, or distinguished between the structure of the clubhouse versus tennis courts and golf course areas. GSG failed to consider the use of the golf course property and whether the Club would be benefitted by $842,324.00 worth of law enforcement security services. GSG failed to conduct studies to determine; (a) how the Club's golf course property benefits from the police department's services; (b) whether or not a golf course requires the same level of security as do developed multimillion dollar residential homes; (c) the historical use of the Club's property or even that of any other property on the Island, and; (d) whether the Club, as the only non-residential property with an 18-hole golf course on the Island, actually requires the amount of manpower and services included in the special assessment, or whether a Club requires the only the type and level of "security" services already being funded.

The Village argues that there is evidence in the form of deposition testimony that the special assessments benefit the real property by; (i) increasing property values; (ii) preventing vandalism of and access to the island properties; (iii) enhancing the safety and enjoyment of real property; and, (iv) reducing insurance premiums. But GSG failed to provide any evidence that the assessments would have a measurable positive benefit to the Club's real property in any of these respects. There is no evidence in the record to show that any of the real property

9

owners (residential or commercial) would get lower insurance premiums as a result of the Village providing general law enforcement to its residents' real property; there appears to be no evidence in the record of an increase in law enforcement capabilities and patrols as a result of the special assessment; there is no data to show that property values would increase as a benefit of the general law enforcement provided to the Village and Club. Here, the "security" services funded by the special assessment are not "similar" to law enforcement services: they are the same law enforcement services provided before and after the special assessment was passed. Even if a special assessment may constitute replacement funding for services previously funded by ad valorem taxation, those services must pass the special benefit and apportionment tests.

We therefore affirm the trial court's order finding both the 2010 and 2011 assessments are unsupported by competent substantial evidence and are thus invalid.

APPELLEE VILLAGE'S CROSS-APPEAL OF THE FINAL JUDGMENT REGARDING THE 2010 AND 2011 SPECIAL ASSESSMENTS.

The Village argues that there was indeed competent substantial evidence to support the special assessments, and that the trial court erred to find there was none. The Village argues that there was evidence – all in the form of witness testimony – of deterrence of vandalism, enhanced enjoyment of use of property, reduced insurance premiums, enhanced property values. Our review of the record did not disclose any data indicating that

enhanced property values or reduced insurance premiums would occur as a result, and the trial court was not convinced that "enhanced enjoyment of property" as a result of ordinary police services already being provided is a "special benefit to real property" that warranted the special assessments.

Regarding the methodology used by GSG to calculate the special assessments, we defer to the trial court's discretion. The trial court found the assessments were not fairly apportioned by whatever methodology the Village used. Because we conclude there was no competent substantial evidence of a logical relationship between the services provided and the benefit to the property, the Village's cross-appeal from the final judgment fails.

THE 2010 AMENDMENT TO SECTION 170.201 FLORIDA STATUTES (2011)

We review the trial court's conclusions of law on the issue of the single-subject rule and the 2011 amendment to section 170.201 de novo. As set forth in Lewis v. Leon Cnty., 73 So. 3d 151, 153-54 (Fla. 2011):

> Although our review is de novo, statutes come clothed with a presumption of constitutionality and must be construed whenever possible to effect a constitutional outcome. "[S]hould any doubt exist that an act is in violation . . . of any constitutional provision, the presumption is in favor of constitutionality. To overcome the presumption, the invalidity must appear beyond reasonable doubt, for it must be assumed the legislature intended to enact a valid law."

Given the presumption of constitutionality and legislative validity, the single subject rule requires that, 1) the law embrace one subject, 2) the law may include any matter that is "properly connected" to the subject, and 3) the subject shall be

briefly included in the title.[2] An amendment or provision is "properly connected" to the subject if the connection is natural or logical, or if there is a reasonable explanation for how the provision is necessary to the subject, or tends to make the purpose of the legislation more effective. Franklin v. State, 73 So. 3d at 153 (Fla. 2004). The party challenging the validity of the legislation must prove invalidity *beyond a reasonable doubt.* Id. at 153.

We affirm the trial court's determination that the 2011 amendment to section 170.201 was constitutional. The trial court determined that the first prong of the 2011 special assessment was not supported by competent substantial evidence – there was nothing in the record to show that the Club's real property got any additional "special" benefit from the assessment's funding of Village security services. The Club argues that the trial court should not have gone further to rule that special benefit to the real property was established by the 2011 legislative amendment to section 170.201, and that the statute was constitutional because the amendment was related to government accountability. The Club asks this Court to find the 2011 legislative amendment to section 170.201 violated the single subject rule because it was unrelated to the subject matter of the bill, and was thus unconstitutional. If the amendment to the statute were unconstitutional, the Club

---

[2] The short title of Chapter 170 is "An act relating to local government accountability." The floor amendment to the statute introduced a mechanism to allow small municipalities to find alternative methods to fund "special security and crime prevention services and facilities, including guard and gatehouse facilities" through special assessments. The bill was signed by the Governor in June 2011 and became effective October 1, 2011.

argues, the trial court could not have found that the 2011 special assessment met the first prong of City of Boca's test (special benefit to real property) simply by virtue of being included in the legislation.

We understand the Appellant's arguments on this issue. The title and substance of the bill is not so unrelated, however, to the bill's overall nature to warrant reversing in what would in essence be a futile act – if the panel declares the amendment unconstitutional by finding the 2011 amendment violated the single subject rule, and as a result the first prong of the special assessments test (benefit to real property) was not met, the outcome remains the same: the 2011 assessment against the Club is still invalid because it did not meet either the first or the second prong of Boca's special assessment test, i.e., no special benefit to real property and unreasonable apportionment of the assessment against Club property. "When a single subject could not be easily determined, and when doubts arose as to whether the various provisions were connected to the subject this Court has consistently analyzed the act with every reasonable doubt in favor of validity. Franklin, 887 So. 2d at 1075. We therefore affirm the trial court on this issue.

ORDER GRANTING THE VILLAGE'S MOTION FOR PARTIAL SUMMARY JUDGMENT INVALIDATING THE 1996 AGREEMENT BETWEEN THE TWO PARTIES

The 1996 Agreement between the two parties contains language that limited the Village's ability to impose future assessments against the Club by limiting any future special assessments to the current ad valorem tax rate: "The Club agrees to

13

pay its share pro rata to its assessed valuation of any special tax assessment levied against all property in the Village." The Village argued that this tied its hands as to any future increase in assessments against the Club. In order to get around this, the Village challenged the validity of the Agreement itself by arguing that four of the Village Council members who voted in favor of the Agreement were also Club Members or were married to Club Members and thus had a vested interest in voting for the Agreement. The trial court agreed that this dual status created a conflict of interest, and those Council Members should have abstained from voting on the Agreement. The trial court based its conclusion following section 112.3143 (3), Florida Statutes (2013) which provides,

> (3)(a) No county, municipal, or other local public officer shall vote in an official capacity upon any measure which would inure to his or her special private gain or loss; which he or she knows would inure to the special private gain or loss of any principal by whom he or she is retained or to the parent organization or subsidiary of a corporate principal by which he or she is retained, other than an agency as defined in s. 112.312(2); or which he or she knows would inure to the special private gain or loss of a relative or business associate of the public officer. Such public officer shall, prior to the vote being taken, publicly state to the assembly the nature of the officer's interest in the matter from which he or she is abstaining from voting and, within 15 days after the vote occurs, disclose the nature of his or her interest as a public record in a memorandum filed with the person responsible for recording the minutes of the meeting, who shall incorporate the memorandum in the minutes.

The trial court concluded that this statute controlled the actions of the Mayor and three Village Council Members who were also Club Members, and that the contract was voidable.[3]

What is considered a threshold "private gain or loss" is also set forth in section 112.3143(d)(1), (2), and (3), which provide:

(d) "Special private gain or loss" means an economic benefit or harm that would inure to the officer, his or her relative, business associate, or principal, unless the measure affects a class that includes the officer, his or her relative, business associate, or principal, in which case, at least the following factors must be considered when determining whether a special private gain or loss exists:

1. The size of the class affected by the vote.

2. The nature of the interests involved.

3. The degree to which the interests of all members of the class are affected by the vote.

4. The degree to which the officer, his or her relative, business associate, or principal receives a greater benefit or harm when compared to other members of the class.

The degree to which there is uncertainty at the time of the vote as to whether there would be any economic benefit or harm to the public officer, his or her relative, business associate, or principal and, if so, the nature or degree of the economic benefit or harm must also be considered.

§ 112.3143, Fla. Stat. (2013). The Club points out that, by these measures, any "interest" those voting Council Members had in approving the Agreement does not rise to the level of "special private gain or loss." The size of the Club Membership class at the time was around 291 persons; the nature of the interests involved were speculative, that is, there were no special assessments planned in 1996, and indeed

---

[3] (1) Any contract that has been executed in violation of this part is voidable: (a) By any party to the contract. Fla. Stat. Ann. § 112.3175 (West).

none occurred until 2010; the degree to which the interests of all Club members may have been affected by the vote was not known until 2010, and then the Club would have to apportion that special assessment across all the Club membership, thus diluting any "special private gain or loss" to the four Club members who voted for the 1996 Agreement.

As the financial impact of the 1996 Agreement on the financial interests of the four voting Club members was speculative, we conclude that it was not a statutory voting ethics violation at the time of the execution of the Agreement, and therefore reverse the Partial Summary Judgment finding the 1996 Agreement voidable.

CONCLUSION

We affirm the Final Judgment regarding the 2010 and 2011 special assessments, and reverse the Partial Summary Judgment regarding the 1996 Agreement.